925 P.2d 324

Marilyn LEE, as Special Administratrix of the Estate of Anthony Wayne Perreira; Felicidad Perreira; and Antone G. Perreira, Plaintiffs–Appellants,

v.

Manuel CORREGEDORE; State of Hawai'i; John Does 1–10; and Doe Governmental Entities 11–20, Defendants–Appellees.

No. 17017.

Supreme Court of Hawai'i.

Oct. 3, 1996.

Eric A. Seitz, Honolulu, for plaintiffs-appellants.

Wesley F. Fong and James W. Laseter, Deputy Attorneys General, Honolulu, for defendants-appellees.

MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

NAKAYAMA, Justice.

In this proceeding arising from Anthony Wayne Perreira's (Perreira) suicide, plaintiffs-appellants Marilyn Lee, as special administratrix of the decedent's estate, Felicidad Perreira, and Antone Perreira (collectively, Appellants) appeal from a summary judgment granted in favor of defendants-appellees Manuel Corregedore and the State of Hawai'i (collectively, Appellees), in a wrongful death action. On appeal, Appellants contend that the circuit court erred in concluding that Appellees did not have a duty to prevent Perreira's suicide. For the following reasons, we reject Appellants' contention and affirm the summary judgment.

## I. BACKGROUND

Perreira was a disabled Vietnam veteran who suffered from neurological and psychiatric problems. He was under the care of a psychiatrist and social worker at the Veterans Administration Clinic on Kaua'i. Additionally, Perreira regularly received help from Manuel Corregedore (Corregedore), a Veterans' Services Counselor IV, at the State of Hawai'i's Office of Veterans' Services.

Prior to working for the Office of Veterans' Services, Corregedore had spent twenty-two years in the army. He had received an Associate of Arts degree in Liberal Arts from the University of Hawai'i. Corregedore had no training or license in psychiatry or psychology; however, he did receive some training in mental health and suicide prevention while in the military.

According to its official job description, the duties of a Veterans' Services Counselor IV included: identifying clients' needs and problems; referring them for services related to their needs and problems; and helping clients obtain education, employment and benefits for which they are eligible.[1] In an affidavit, Corregedore described his job duties as

> making sure veterans receive all the benefits they are entitled to, coordinating with various agencies to procure the appropriate services, such as job training and educational programs and mental health services and counseling them regarding their day-to-day problems.... The counseling which I provide to veterans consists of identifying their concerns or problems, and

---

1. The official job description of a Veterans' Services Counselor IV specifies numerous duties including the following which are relevant to the instant appeal:

 A. Veteran Services
 1. Interview and counsel eligible clients; identify their particular needs or problems;

> decide the appropriate action to be taken and provide the necessary services; apply various interviewing and counseling techniques in assisting the clients to seek further education, suitable employment, and/or benefits for which they may be eligible.

explaining the options available to them to deal with the problem. The problems generally consist of housing, employment, financial, education or benefits matters.... I do not provide psychiatric or psychological services to the veterans I counsel. My counseling mainly consists of listening and empathizing with the veterans.... When confronted with a client with emotional or mental problems I always make arrangements for them to be seen by a mental health professional at the U.S. Veterans Center for evaluation and/or treatment.

Prior to their professional relationship, Perreira and Corregedore had known each other in a personal capacity since the 1960s. They had met each other through family connections and had accompanied each other to veterans' meetings and family gatherings. They had even taken a ten-day trip to Disneyland together. Perreira had also lived at Corregedore's home for a month.

Their professional relationship began when Perreira's mother approached Corregedore at the Office of Veterans' Services, seeking additional help for her son. Corregedore then initiated contact with Perreira by visiting Perreira at his house to assess which services he needed. The services that Corregedore ultimately provided included bill payments, a referral to a speech therapist, and informal visits where they would "talk story" and where Perreira would "let off steam." Corregedore also participated in discussions about establishing a guardianship for Perreira; however, the guardianship never came to fruition.

Perreira had threatened to commit suicide at least two times prior to his death. In 1990, Perreira threatened to commit suicide during a conference between Corregedore, Perreira, Perreira's father, Perreira's psychiatrist and Perreira's social worker. In March 1991, Perreira threatened to kill himself while he was at the police station being photographed and fingerprinted in connection with unspecified legal difficulties.

On the morning of July 19, 1991, Perreira called Corregedore at home to see if Corregedore would be at the Office of Veterans'

Services that morning. Thereafter, Perreira and his father arrived at Corregedore's office at approximately 9:30 a.m. While waiting for Corregedore to finish with another client, Perreira told Corregedore's secretary, Jocelyn Miyake, that he was going to "jump Hanapepe Bay Valley, if not I'm going to Kokee." Perreira then asked Miyake to "write down what he wanted after he died." The document that Perreira dictated to Miyake stated:

7–19–91

Anthony Perreira's Request

All of his clothes to be given to the Salvation Army

Jewelry, Army Coat, and Camouflage Baseball Cap to be buried with him also Virgin Mary Statue.

All his money to be given to Parents.

TV. Bed to be left in his room.

[Signed]

Anthony W. Perreira

When Perreira saw Corregedore, he told Corregedore that he was going to kill himself at Hanapepe Bay Lookout. Corregedore told Perreira that he was going to call Perreira's social worker at the clinic and that they would all talk, but Perreira refused to listen and walked out of the office. As Perreira was leaving the office, Miyake showed Corregedore the document that Perreira had dictated to her. According to Corregedore, he showed the document to Perreira's father, told him about the suicide threat, and urged him "to keep an eye on [Perreira]." Conversely, Perreira's father later claimed that this brief conversation did not take place. After Perreira and his father left, Corregedore called Perreira's social worker, Gary Malinoski, and told him of Perreira's suicide threat; Malinoski said that he would follow up immediately, and did so, but it was too late to save Perreira. On his way home, Perreira asked his father to drive to Hanapepe Bay Lookout. When the pair arrived at the lookout, Perreira got out of the car and jumped to his death.

On February 10, 1992, Appellants filed a complaint for damages against Corregedore and the State. The complaint alleged that Corregedore had a duty arising from his professional relationship with Perreira to prevent Perreira from "causing and/or exposing himself to any serious injury and/or harm which was reasonably foreseeable," and that he breached this duty by failing to warn the father that Perreira was suicidal. A second allegation was that Corregedore had a "duty arising from [his] specific knowledge and information that ... Perreira stated he was going to kill himself to inform and/or warn his parents and/or other responsible persons or authorities of ... Perreira's statements and thereby prevent [the suicide]." Corregedore and the State answered the complaint on March 13, 1992, and filed a motion for summary judgment on September 10, 1992, alleging that Corregedore had no duty to prevent Perreira's suicide. The circuit court granted Corregedore and the State's motion for summary judgment on March 31, 1993, from which Appellants filed this appeal.

## II. STANDARD OF REVIEW

■ The issue in this case is whether the circuit court erred when it granted summary judgment in favor of Appellees on the basis that Corregedore owed no duty to prevent Perreira's suicide. We review the circuit court's award of summary judgment *de novo* under the same standard applied by the circuit court. *Maguire v. Hilton Hotels Corp.*, 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995).

> Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.

*Id.* (citations, emphasis, and brackets omitted).

■ "The existence of duty ... is entirely a question of law." *Birmingham v. Fodor's Travel Publications*, 73 Haw. 359, 366, 833 P.2d 70, 74 (1992). This court reviews questions of law under the right/wrong standard. "Under the right/wrong standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it." *State v. Meyer*, 78 Hawai'i 308, 311, 893 P.2d 159, 162 (1995) (citations omitted).

## III. DISCUSSION

Appellants maintain that Appellees had a duty to prevent Perreira's suicide, and, although the analysis is sometimes unclear, Appellants appear to posit three theories. First, Appellants contend that the duty arises from a "special relationship" between Veterans' Services Counselors and their clients. Appellants argue that, "Corregedore's duty was the same as any mental health professional to his client," when a suicide was foreseeable. Appellants express their second theory by asserting that "Perreira's suicide was entirely foreseeable giving rise to a duty on the part of Appellee Corregedore," and thus, Appellants seem to assert that foreseeability alone is sufficient to create a duty on the part of counselors to prevent the suicides of their noncustodial clients. Third, Appellants "seek a ruling from the Court that recognizes the protected status of veterans, as a class, and determines that the lower court erred in finding that Mr. Corregedore had no duty in the instant case." Apparently, this is a claim that Corregedore had a statutory duty to prevent the suicide pursuant to Hawai'i Revised Statutes (HRS) Chapter 363 (1993), Veterans Rights and Benefits.

A. *Counselors Do Not Have a Duty to Prevent the Suicides of Noncustodial Clients, Regardless of Whether the Suicides Are Foreseeable*

■ "A prerequisite to any negligence action is the existence of a duty owed by the defendant to the plaintiff[,]" *Maguire*, 79 Hawai'i at 112, 899 P.2d at 395 (citations omitted), "requiring the actor to conform to a certain standard of conduct for the protection

of others against unreasonable risks." *Birmingham*, 73. Haw. at 366, 833 P.2d at 74 (citations omitted). The general rule is that a person does not have a duty to act affirmatively to protect another person from harm. "The fact that the actor realizes or should realize that action on his [or her] part is necessary for another's aid or protection does not of itself impose upon him [or her] a duty to take such action." Restatement (Second) of Torts § 314 (1965).

■ The exceptions to this general rule arise when a "special relationship" exists between the actor and the individual facing harm. In determining whether such a relationship exists, section 314A(4) of the Restatement (Second) of Torts (1965) [2] provides that, "one who is required by law to take or who voluntarily takes the *custody* of another under circumstances such as to deprive the other of his normal opportunities for protection is under a . . . duty [to take reasonable action to protect the other person from unreasonable risk of physical harm]." (Emphasis added).

Thus, in the absence of custody, we have held that a prosecuting attorney and a mentally ill criminal defendant did not have a special relationship sufficient to impose a duty on the prosecuting attorney to prevent the mentally ill criminal defendant from murdering a fifteen year old girl, despite that a court had acquitted and released the mentally ill criminal defendant only under the condition that he continue to receive psychiatric treatment from a court-appointed psychiatrist, who, in turn, was required to send monthly progress reports to the prosecuting attorney and the court. *Seibel v. City and County of Honolulu*, 61 Haw. 253, 258–61, 602 P.2d 532, 537–38 (1979). The pivotal issue was whether the prosecuting attorney

had "custody or control" over the mentally ill criminal defendant:

To begin with, we find it useful to examine the reasons for a similar duty which can be imposed in other relationships, such as that of a parent to *control* his child, a master to *control* his servant, and an institutional *custodian* to *control* its wards. The basis for imposing a duty on the parent, master or institutional *custodian* to *control* the conduct of a child, servant or ward is that, because of the relationship between the parties, the parent, master or institutional *custodian* is able or should be able to foresee the risk created by the other and can or should be able to take precautions against that risk. However, unlike the parent, master or institutional *custodian* who has De facto or De jure *custody or control* over the child, servant or ward, the [prosecuting attorney] did *not* have *custody or control* over [the mentally ill criminal defendant]. In the *absence of control* over [the mentally ill criminal defendant], we find *no special relationship* between the [prosecuting attorney] and [the mentally ill criminal defendant]. . . .

. . . The prosecuting attorney did not, and ordinarily does not, exercise *a degree of supervision* over a conditionally released defendant which could compel a conclusion that the professional relationship between the parties was *a form of custody*.

*Id.* at 260, 602 P.2d at 537–38 (emphases added and footnotes omitted).

■ On the other hand, when the State has actually had custody of a person, such as a prisoner, we have held that the "[S]tate, by reason of the special relationship created by its *custody* of [the] prisoner, is under a duty

2. The Restatement (Second) of Torts § 314A (1965) provides:
§ 314A. Special Relations Giving Rise to Duty to Aid or Protect
 (1) A common carrier is under a duty to its passengers to take reasonable action
 (a) to protect them against unreasonable risk of physical harm, and
 (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.

 (2) An innkeeper is under a similar duty to his [or her] guests.
 (3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his [or her] invitation.
 (4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his [or her] normal opportunities for protection is under a similar duty to the other.

to the prisoner to take reasonable action to protect the prisoner against unreasonable risk of physical harm." *Haworth v. State*, 60 Haw. 557, 563, 592 P.2d 820, 824 (1979) (citing in footnote 4, *inter alia*, Restatement (Second) of Torts § 314) (holding that the State's duty to exercise reasonable care for the safety of a prisoner continued during the prisoner's work assignment).

The duty arises out of the *deprivation* by the state of the prisoner's normal *opportunities to protect* himself, particularly through places or situations which involve risk. When the *custodial* authorities are charged with knowledge that the prisoner may incur harm unless preclusive measures are taken, reasonable care must be exercised to prevent such harm.

... Since the danger arose from the exercise of the State's *authority* over appellant as a prisoner, a duty to exercise reasonable care to avoid the danger arose on familiar tort principles.

*Id.* at 563–65 592 P.2d at 824–25 (emphases added).

■■■■ The general rule regarding the protection of others also applies to suicide prevention. Generally, an actor will not be held liable for the suicide of another "because suicide constitutes an independent intervening act so extraordinary as not to have been reasonably foreseeable by the original tortfeasor." *McPeake v. William T. Cannon, Esquire, P.C.*, 381 Pa.Super. 227, 553 A.2d 439, 441 (1989) (citations omitted). But, if a special relationship exists and the suicide is reasonably foreseeable, only then would the actor be required to take action that was reasonable under the circumstances. Therefore, without a special relationship and foreseeability, an actor would not be legally required to affirmatively act to prevent a suicide.

Although duty is comprised of two mutually dependent elements, Appellants' arguments focus on the need for a special relationship, which is, in essence, a threshold determination. Accordingly, if there is no special relationship, then there is no duty. Due to the absence of Hawai'i case law focusing on the type of special relationship required to impose a duty on an actor to pre-

vent the suicide of another person, we turn to other jurisdictions for guidance.

"To reach the conclusion that a special relationship exists, it must be assumed that the harm to be prevented by the defendant is one that the defendant is in a position to protect against and should be expected to protect against." *Donaldson v. YWCA*, 539 N.W.2d 789, 792 (Minn.1995) (citation omitted) (holding that a lodging house serving low-income individuals, including many with mental health problems, had no duty to prevent residents from committing suicide). "Courts have traditionally shown reluctance to impose liability on others for self-inflicted harm." *Id.* (citation omitted). Thus, it is no surprise that a review of cases in other jurisdictions advances only one type of special relationship that consistently imposes a duty on an actor to prevent another's suicide, namely a relationship predicated on a custodial relationship. Negligence actions for the suicide of another will generally not lie since the act of suicide is considered a deliberate intervening act exonerating the defendant from legal responsibility. *Krieg v. Massey*, 239 Mont. 469, 781 P.2d 277, 279 (1989) (citation omitted) (holding that a landlord-tenant relationship was not a custodial relationship imposing a duty on the landlord to prevent a tenant's suicide, despite that an apartment manager had taken a pistol from the disturbed tenant's hands and put it on the top of the tenant's closet prior to his suicide). An exception to this rule "allows the imposition of a duty to prevent suicide but only in a custodial situation where suicide is foreseeable." *Id.*; *accord, Donaldson*, 539 N.W.2d at 792–93; *Cygan v. City of New York*, 165 A.D.2d 58, 566 N.Y.S.2d 232, 238 (1991) (holding that a city was not liable for negligence by having failed to prevent a city police officer from committing suicide with his service revolver, because "the [c]ity had neither custody nor control over [the police officer]"), *appeal denied*, 78 N.Y.2d 855, 573 N.Y.S.2d 645, 578 N.E.2d 443 (1991); *McPeake*, 553 A.2d at 443 ("[W]e hold that an attorney's duty to provide adequate representation does not encompass the duty to foresee and protect a client from his own possible suicidal tendencies."); *Nally v.*

*Grace Community Church*, 47 Cal.3d 278, 253 Cal.Rptr. 97, 105–06, 763 P.2d 948, 956 (1988) (holding that nontherapist counselors did not have a duty to prevent the suicide of a person who was not in their custody), *cert. denied*, 490 U.S. 1007, 109 S.Ct. 1644, 104 L.Ed.2d 159 (1989); *DeMontiney v. Desert Manor Convalescent Center Inc.*, 144 Ariz. 6, 695 P.2d 255, 259–60 (1985) (when a private health care facility is charged with the care and custody of suicidal persons, the private health care facility has a duty to take reasonable steps to prevent suicide); *Katona v. County of Los Angeles*, 172 Cal.App.3d 53, 218 Cal.Rptr. 19, 22 (1985) (holding that county mental health facilities did not have a duty to prevent a suicidal patient from killing herself after the patient's unconditional release); *McLaughlin v. Sullivan*, 123 N.H. 335, 461 A.2d 123, 127 (1983) (holding that an attorney did not have a duty to prevent her client's suicide); *City of Belen v. Harrell*, 93 N.M. 601, 603 P.2d 711, 713 (1979) ("When one party is in the custodial care of another, as in the case of a jailed prisoner, the custodian has the duty to exercise reasonable and ordinary care for the protection of the life and health of the person in custody.").

Accordingly, we have followed the Restatement (Second) of Torts § 314A(4) and recognized a reasonable duty of care to prevent suicide only on the part of a defendant who had actual custody of a suicidal person. *Figueroa v. State*, 61 Haw. 369, 376–80, 604 P.2d 1198, 1202–04 (1979). When a juvenile (Michael) attempted suicide while in the custody of the Hawai'i Youth Correctional Facility (Boys' Home), we held that the State's duty to exercise reasonable care to prevent the juvenile's suicide arose from the existence of the custodial relationship between the Boys' Home and the juvenile:

> The State's duty to Michael to exercise reasonable care arises from the relationship created between the two as a result of Michael's *commitment* to the Boys' Home. Michael was *committed* to the Boys' Home by the Family Court and so long as he was in its *custody*, the law provides that the director of social services "shall be the *guardian* of the person of every child *committed* to or received at" H[awai'i Youth Correctional Facility]. HRS § 352–9

(1976); see Restatement (Second) of Torts § 314A(4).

. . . .

> In the view we take of this case, . . . the State's negligence, if any, upon which liability for the injuries sustained by Michael may be imposed, can only be predicated on the manner of the observation and *supervision* of Michael in the *isolation cell* after he was *confined in isolation* as a result of his runaway attempt.

*Id.* at 376–77, 604 P.2d at 1202–03 (emphases added).

*Figueroa* is distinguishable from the instant case because, unlike the plaintiff in *Figueroa*, Perreira was not a prisoner of the State, and thus, Corregedore and the State did not have custody, control, guardianship, or authority over Perreira. Additionally, while the incarcerated plaintiff in *Figueroa* was a mere juvenile, Perreira was a forty-two year old man who, as an independent adult, had the right to enter and leave the Veterans Administration Clinic and the Office of Veterans' Services as he pleased, as well as the right to make his own decisions regarding his health care. Pursuant to Hawai'i case law and the Restatement (Second) of Torts § 314A(4), because Perreira was not in the custody of Corregedore and the State, a special relationship did not exist to impose a duty on Corregedore and the State to prevent Perreira's suicide.

The dissent's gratuitous citation to *Touchette v. Ganal*, 82 Hawai'i 293, 922 P.2d 347 (1996), Dissent at 179, n. 1, 925 P.2d at 344, n. 1, in "connection" with the proposition that "[t]he law appears . . . to be working slowly toward a recognition of the duty to aid or protect in any relation of dependence or of mutual dependence[,]" Dissent at 179, 925 P.2d at 344 (quoting Restatement (Second) of Torts § 314A comment b (1965)), reflects a fundamental misunderstanding and misinterpretation or our analysis and holdings in that case. *Touchette* is clearly inapposite.

Wendy Touchette was severely injured, and her husband and two children killed, in a fire deliberately set by Orlando Ganal. Touchette, in her individual capacity and as spe-

cial administratrix, brought an action against, *inter alia*, Mabel Ganal (Mabel), Orlando's wife. The circuit court granted Mabel's motion to dismiss, stating that, "pursuant to § 315 Restatement of Torts (Second) and Hawaii case law[,] Defendant Mabel Ganal had no duty to control the conduct of Orlando T. Ganal, Sr.[,] as no required 'special relationship' was alleged or shown at hearing." *Touchette*, at 297, 922 P.2d at 351.

This court agreed. After reviewing sections 314 and 315 of the Restatement, we explained that, "applied to the present case, Mabel would owe a duty to appellant under sections 315 and 314A only if Mabel bore a 'special relation' to either appellant or Ganal[,]" *id.* at 299, 922 P.2d at 353, and held that "*the circuit court's order granting Mabel's motion to dismiss was correct insofar as it held that Mabel did not owe a duty to appellant under sections 315 and 314A because Mabel did not bear a 'special relation' to either appellant or Ganal as contemplated by the language of section 315.*" *Id.* at 301, 922 P.2d at 355 (emphasis added).

In *Touchette*, we further explained, however, that the circuit court erred in dismissing Touchette's complaint against Mabel *solely* on the basis that Mabel owed Touchette no duty pursuant to sections 315 and 314A. Because (1) "[a] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that no relief can be granted under any set of facts that can be proved in support of its allegations[,]" *id.* at 303, 922 P.2d at 357 (citations omitted), and (2) "the allegations [of affirmative conduct by Mabel] state a claim that potentially could warrant relief under a theory based on the duty stated in sections 302, 302A and/or 302B[,]" this court vacated the circuit court's order granting Mabel's motion to dismiss. *Id.* at 304, 922 P.2d at 358.

Sections 302, 302A, and 302B have no application in this case. As we noted in *Touchette*,

> [section 302] is concerned only with the negligent character of the actor's conduct, and not with his [or her] duty to avoid the unreasonable risk. In general, *anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable [person] to protect them against an unreasonable risk of harm to them arising out of the act.* The duties of one who merely omits to act are more restricted, and in general are confined to situations where there is a special relation between the actor and the other which gives rise to the duty.

*Id.* at 301–02, 922 P.2d at 355–56 (quoting Restatement (Second) of Torts, § 302 comment a (1965)) (emphasis added). The distinction between sections 315 and 314A, on the one hand, and sections 302, 302A, and 302B, on the other, is based on the common law distinction between "nonfeasance" and "misfeasance." *Id.* Our holding in *Touchette* was premised upon that distinction. Had Touchette's claim against Mabel alleged only "nonfeasance," *i.e.*, Mabel's failure to control Ganal's conduct or to warn Touchette, dismissal would have been appropriate. However, this court determined that "appellant's complaint against Mabel in the present case alleges affirmative conduct, or alleged 'misfeasance' on the part of Mabel, . . . thereby implicating the duty described by sections 302, 302A[,] and 302B." *Id.* at 304, 922 P.2d at 358. In contrast, there are no such allegations in the instant case, and, thus, sections 302, 302A, and 302B are not implicated.

Case law from other jurisdictions supports our holding. "Liability against therapists for outpatient suicides is rarely imposed, . . . and some commentators have suggested that liability under these circumstances should never be imposed." *Eisel v. Board of Education*, 324 Md. 376, 597 A.2d 447, 450 (1991) (citations omitted); *see also, Hoeffner v. The Citadel*, 311 S.C. 361, 429 S.E.2d 190, 194 (1993) (rejecting the imposition of "a strict duty upon health care professionals to take extreme action whenever a patient expresses signs of depression"); *King v. Smith*, 539 So.2d 262, 264 (Ala.1989) (holding that, "in view of the outpatient character of their relationship," a psychiatrist and his patient did not have a "special relationship or circumstance necessary to make [the psychiatrist] liable for [the patient]'s . . . subsequent suicide"); *Paddock v. Chacko*, 522 So.2d 410, 417 (Fla.Dist.Ct.App.1988) (holding that a psychiatrist "had no duty to take [a suicidal

outpatient] into his custody to prevent her from inflicting injury upon herself"), *review denied*, 553 So.2d 168 (Fla.1989); *Stepakoff v. Kantar*, 393 Mass. 836, 473 N.E.2d 1131, 1135 (1985) (rejecting a plaintiff's argument that, after a psychiatrist diagnoses "a patient as suicidal, the psychiatrist's duty to take preventative measures becomes one of 'reasonableness'"); *Paradies v. Benedictine Hospital*, 77 A.D.2d 757, 431 N.Y.S.2d 175, 178 (1980) (affirming summary judgment in favor of a psychiatrist because the law did not impose a continuing duty to exercise a parental role over a discharged patient who subsequently committed suicide), *appeal dismissed*, 51 N.Y.2d 1006, 435 N.Y.S.2d 982, 417 N.E.2d 94 (1980), *appeal dismissed*, 51 N.Y.2d 710, 435 N.Y.S.2d 1026, 417 N.E.2d 96 (1980); *Bellah v. Greenson*, 81 Cal.App.3d 614, 146 Cal.Rptr. 535, 539 (1978) ("The imposition of a duty upon a psychiatrist to disclose to others vague or even specific manifestations of suicidal tendencies on the part of the patient who is being treated in an outpatient setting could well inhibit psychiatric treatment."); *Runyon v. Reid*, 510 P.2d 943, 949–51 (Okla.1973) (affirming summary judgment in favor of a psychiatrist where a decedent had committed suicide as an out-patient).

For example, despite that the California Supreme Court had already held that a psychotherapist had a duty to warn others when a patient under the psychotherapist's care was likely to cause personal injury to a third party, *Tarasoff v. Regents of the University of California*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976), a California appellate court subsequently limited *Tarasoff*, holding that courts should not extend *Tarasoff* to require psychiatrists to disclose the confidences of their patients when the patients are contemplating suicide. *Bellah v. Greenson*, 146 Cal.Rptr. 535, 539–40. In *Bellah*, a psychiatrist had not warned his patient's parents about the patient's suicidal disposition, and the patient eventually succumbed to a self-inflicted overdose of pills. Despite that the psychiatrist did not have custody of the patient at the time of her suicide, the patient's parents sued the psychiatrist for wrongful death, alleging, among other things, the psychiatrist's negligent failure to warn the parents about the patient's suicidal disposition. Although the *Bellah* court affirmed the trial court's order sustaining the psychiatrist's demurrer pursuant to a statute of limitations, the *Bellah* court proceeded to explain that, while a cause of action might exist for traditional, professional malpractice when a psychiatrist's treatment of a suicidal patient falls below the standard of care for the profession, the plaintiffs were wrong in asserting that *Tarasoff* had created a broad duty on the part of psychiatrists to breach the confidence of their doctor-patient relationships by warning others of the likelihood of a patient's suicidal disposition:

> The imposition of a duty upon a psychiatrist to disclose to others vague or even specific manifestations of suicidal tendencies on the part of the patient who is being treated in an out-patient setting could well *inhibit psychiatric treatment.* In his amicus brief, counsel points out that the dynamics of interaction between the psychotherapist and the patient seen in office visits are highly complex and subtle. *Intimate privacy is a virtual necessity* for successful treatment. Were it not for the assurance of *confidentiality* in the psychotherapist-patient relationship, many in need of treatment would be *reluctant* to seek help. Even those who do seek help under such circumstances may be *deterred* from fully disclosing their problems. An element usually assumed essential is the patient's trust that matters disclosed in therapy will be held in strict confidence. (See Fleming and Maximov, *The Patient or His Victim: The Therapist's Dilemma* (1974) 63 Cal.L.Rev. 1025, 1041.)

> We conclude that *Tarasoff v. Regents of University of California, supra*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, requires only that a therapist disclose the contents of a confidential communication where the risk to be prevented thereby is the danger of violent assault, and not where the risk of harm is self-inflicted harm or mere property damage. We decline to further extend the holding of *Tarasoff.*

*Id.* 146 Cal.Rptr. at 539–40 (emphases added).

Two years later, the California Supreme Court referred to *Bellah* as supporting authority when it rejected the assertion "that the duty to prevent suicide ... or the general professional duty of care ... should be extended to a nontherapist counselor who offers counseling to a potentially suicidal person on secular or spiritual matters." *Nally*, 253 Cal.Rptr. 97, 110, 763 P.2d 948, 960–61. Nally, a troubled and depressed twenty-four year old college student, had sought counseling from nontherapist counselors (i.e., persons other than licensed psychotherapists, who counsel others concerning their emotional and spiritual problems) at Grace Community Church. Although the counselors at Grace Community Church did not conduct professional or clinical counseling, they conducted "pastoral counseling" through instruction, study, prayer, guidance, and mentoring relationships. During a period of five years Nally took part in various pastoral counseling sessions, and in some sessions he stated that he had contemplated suicide. Nally eventually killed himself, and his parents sued Grace Community Church for, among other things, both "clergyman malpractice" and general negligence with respect to the counselors' failure to prevent Nally's suicide.

In considering whether to recognize a duty of care on the part of counselors, the *Nally* court stated that it must consider several factors, including the issue of whether a special relationship exists between suicidal individuals and their counselors, the foreseeability of harm to the injured party, the degree of certainty that the injured party suffered injury, the closeness of the connection between the defendants' conduct and the injury suffered, the moral blame attached to the defendants, the policy of preventing harm, the extent of the burden to the defendants and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. *Id.* at 105–06, 763 P.2d at 956. Emphasizing the issue of whether a special relationship existed, the *Nally* court approvingly referred to *Bellah* as holding "that courts should not extend *Tarasoff* to require psychiatrists to disclose the confidences of their patients when harm to a third party is *not*

contemplated." *Id.* at 107, 763 P.2d at 958 (emphasis added). Although, in *Bellah*, an intermediate appellate court had also attempted to acknowledge through dictum that a cause of action might exist for professional malpractice when a psychiatrist's treatment of a noncustodial suicidal patient falls below the standard of care for the profession, *Bellah*, 146 Cal.Rptr. at 538, the *Nally* court specifically *rejected* the notion that *Bellah* had imposed an affirmative duty on psychiatrists to prevent their noncustodial patients from committing suicide. *Nally*, 253 Cal. Rptr. at 107–08, 763 P.2d at 958.

> *Bellah* ... *never imposed an affirmative duty on a psychiatrist to see that his patient does not ... harm himself.* If such were the case, psychiatrists could be held responsible whenever one of their patients made the unfortunate decision to take his own life. We reject such a broad interpretation of the *Bellah* dictum, and emphasize that ... *[the Bellah court] never decided the duty issue.*

*Id.* at 107 n. 6, 763 P.2d at 958 n. 6 (emphases added; citations and quotation marks omitted). Neither *Bellah* nor any other California cases "support[ed] the finding of a special relationship between Nally and defendants, or the imposition of a duty to refer a suicidal person to a professional therapist[,]" and, in fact, *Bellah* and the other relevant California cases "weigh[ed] against creating such a duty." *Id.* at 108, 763 P.2d at 958.

The *Nally* court also analyzed "the closeness of the causal connection between defendants' conduct and the injury suffered, and the foreseeability of the particular harm to the injured party." *Id.*

> Generally, there is a real question about the closeness of the causal connection between a nontherapist counselor's failure to refer to professional help and the suicide of a particular suicidal person. By their very definition, nontherapist counselors are not professional medical experts on suicide. Their activities are undertaken pursuant to doctrines explicitly left unregulated by the state.

*Id.* at 108 n. 7, 763 P.2d at 958–59 n. 7. Thus, the *Nally* court concluded that "[t]he

closeness of connection between defendants['] conduct and Nally's suicide was tenuous at best." *Id.* at 108, 763 P.2d at 958.

With respect to the foreseeability of the particular harm to the injured party,

> [o]ne can argue that it is foreseeable that if a nontherapist counselor fails to refer a potentially suicidal individual to professional, licensed therapeutic care, the individual may commit suicide. While under some circumstances counselors may conclude that referring a client to a psychiatrist is prudent and necessary, our past decisions teach that it is inappropriate to impose a duty to refer —— which may stifle all gratuitous or religious counseling —— based on foreseeability alone. *Mere foreseeability of the harm or knowledge of the danger, is insufficient to create a legally cognizable special relationship giving rise to a legal duty to prevent harm.*

*Id.* at 108, 763 P.2d at 959 (emphasis added and citation omitted).

Additionally, the *Nally* court focused on public policy considerations:

> Imposing a duty on defendants or other nontherapist counselors to ... insure their counselees are also under the care of psychotherapists, psychiatric facilities, or others authorized and equipped to forestall imminent suicide, could have a deleterious effect on counseling in general.... [T]he indeterminate nature of liability ... [of] nontherapist counselors could deter those most in need of help from seeking treatment out of fear that their private disclosures could subject them to involuntary commitment to psychiatric facilities.
>
> ... [N]either the Legislature nor the courts have ever imposed a legal obligation on persons to take affirmative steps to prevent the suicide of one who is not under the care of a physician in a hospital. Indeed, for all practical purposes, a doctor to whom a nontherapist counselor refers a suicidal person may refuse to take the patient.....
>
> We also note that the Legislature has exempted the clergy from the licensing requirements applicable to marriage, family, child and domestic counselors and from the operation of statutes regulating psychologists. In doing so, the Legislature has recognized that access to the clergy for counseling should be free from state imposed counseling standards, and that the secular state is not equipped to ascertain the competence of counseling when performed by those affiliated with religious organizations.
>
> Furthermore, extending liability to voluntary, noncommercial and noncustodial relationships is contrary to the trend in the Legislature to encourage private assistance efforts. This public policy goal is expressed in the acts of the Legislature abrogating the Good Samaritan rule. Statutes barring the imposition of ordinary negligence liability on one who aids another now embrace numerous scenarios.
>
> . . . .
>
> Even assuming that workable standards of care [for nontherapist counselors] could be established in the present case, an additional difficulty arises in attempting to identify with precision those to whom the duty should apply. Because of the differing theological views espoused by the myriad of religions in our state and practiced by church members, it would certainly be impractical, and quite possibly unconstitutional, to impose a duty of care on pastoral counselors. Such a duty would necessarily be intertwined with the religious philosophy of the particular denomination or ecclesiastical teachings of the religious entity. We have previously refused to impose a duty when to do so would involve complex policy decisions, and we are unpersuaded by plaintiffs that we should depart from this policy in the present case.

*Id.* at 108–10, 763 P.2d at 959–60 (citations, brackets and quotation marks omitted).

Finally, the *Nally* court addressed the availability, cost, and prevalence of insurance for nontherapist counselors and "lawsuits stemming from spiritual counseling[.]" *Id.* at 110, 763 P.2d at 960. Although "a new type of clergyman malpractice insurance ha[d] been offered to religious organizations to protect against potential liability for spiritual counseling that causes injury[,]" the *Nally* court concluded that the "value of such insur-

ance, however, is unknown and difficult to determine because few cases have been filed against the clergy." *Id.* (citation and quotation marks omitted).

Thus, the *Nally* court rejected the argument that the duty to prevent suicide or the general professional duty of care should be extended to a "nontherapist counselor who offers counseling to a potentially suicidal person on secular or spiritual matters." *Id.* at 110, 763 P.2d at 960–61. To impose a "broad duty to refer ... would place blame unreasonably and contravene public policy." *Id.* at 110, 763 P.2d at 961 (footnote omitted). Accordingly, the *Nally* court "conclude[d] the trial court [had] correctly granted defendants' nonsuit motion as to the clergyman malpractice or negligence causes of action." *Id.* (quotation marks omitted).

In contrast with the California Supreme Court, we have not had the opportunity to address whether counselors have such a duty until now. However, similar to the *Nally* court, we find no cases in our jurisdiction supporting the finding of a special relationship between counselors and their noncustodial clients sufficient to impose a duty upon counselors to prevent their clients' suicides. Our holding in *Figueroa*, the Restatement (Second) of Torts § 314A(4), and relevant California cases weigh against creating such a duty. *See Figueroa*, 61 Haw. 369, 376–80, 604 P.2d 1198, 1202–04 (citing the Restatement (Second) of Torts § 314A(4)); *Nally*, 253 Cal.Rptr. 97, 107–08, 763 P.2d 948, 958; *Bellah*, 146 Cal.Rptr. 535, 539–40. Because Perreira was not in the custody of Corregedore and the State, a special relationship did not exist to impose a duty on Corregedore and the State to prevent Perreira's suicide.

 In considering whether to impose a duty of reasonable care on a defendant, we recognize that duty is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection. *Waugh v. University of Hawaii*, 63 Haw. 117, 135, 621 P.2d 957, 970 (1980); *Kelley v. Kokua Sales & Supply, Ltd.*, 56 Haw. 204, 207, 532 P.2d 673, 675 (1975). Legal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done. *Id.* (quoting *Tarasoff*, 131 Cal.Rptr. 14, 551 P.2d at 342). In determining whether or not a duty is owed, we must weigh the considerations of policy which favor the appellants' recovery against those which favor limiting the appellees' liability. *Waugh*, 63 Haw. at 135, 621 P.2d at 970; *Kelley*, 56 Haw. at 207, 532 P.2d at 675. The question of whether one owes a duty to another must be decided on a case-by-case basis. *Waugh*, 63 Haw. at 135, 621 P.2d at 970. However, we are reluctant to impose a new duty upon members of our society without any logical, sound, and compelling reasons taking into consideration the social and human relationships of our society. *Birmingham v. Fodor's Travel Publications, Inc.*, 73 Haw. 359, 370–71, 833 P.2d 70, 76 (1992) ("hold[ing] that a publisher of a work of general circulation, that neither authors nor expressly guarantees the contents of its publication, has no duty to warn the reading public of the accuracy of the contents of its publication"); *Johnston v. KFC Nat'l Management Co.*, 71 Haw. 229, 232–33, 788 P.2d 159, 161 (1990) (declining to impose a duty upon non-commercial suppliers of alcohol, i.e., social hosts, to protect third parties from risk of injuries that might be caused by adults who consume the social hosts' alcohol). Under the circumstances of this case, there are no logical, sound, and compelling reasons for imposing a duty on counselors to prevent the suicides of noncustodial clients.

In addition to the lack of a special relationship between counselors and their noncustodial clients, we also regard other factors as relevant that the *Nally* court emphasized in refusing to impose a duty upon counselors. Similar to the *Nally* court, we deem the causal connection between Corregedore's conduct and Perreira's suicide as tenuous, because counselors such as Corregedore are not professional medical experts on suicide. Moreover, without custody and control over an independent adult client, a counselor has little, if any, control over the client's decision-making when the client is beyond the confines of the counselor's office.

We disagree with the Appellants' assertion that foreseeability alone is sufficient to create a duty on the part of counselors to prevent the suicides of their noncustodial clients. Regardless of whether Perreira's suicide was foreseeable, it would be inappropriate to impose a duty on counselors to prevent suicides — which might stifle all such counseling — based on foreseeability alone. Especially in light of our holding in *Figueroa*, 61 Haw. 369, 604 P.2d 1198, and our adoption of the Restatement (Second) of Torts § 314A(4), "[m]ere foreseeability of the harm or knowledge of the danger, is insufficient to create a legally cognizable special relationship giving rise to a legal duty to prevent harm." *Nally*, 253 Cal.Rptr. at 108, 763 P.2d at 959. Foreseeability is endless because it, like light, travels indefinitely in a vacuum. *Bily v. Arthur Young and Co.*, 3 Cal.4th 370, 11 Cal. Rptr.2d 51, 68, 834 P.2d 745, 762 (1992); *Thing v. La Chusa*, 48 Cal.3d 644, 257 Cal. Rptr. 865, 874–75, 771 P.2d 814, 823 (1989). Foreseeability alone proves too much. *Bily*, 11 Cal.Rptr.2d at 68, 834 P.2d at 762; *Thing*, 257 Cal.Rptr. at 877–78, 771 P.2d at 826. "[T]here are clear judicial days on which a court can foresee forever and thus determine liability but none on which that foresight alone provides a socially and judicially acceptable limit on recovery of damages for that injury." *Thing*, 257 Cal.Rptr. at 881, 771 P.2d at 830. Policy considerations may dictate that we should not sanction a cause of action, no matter how foreseeable the risk, for the sound reason that the consequences of a negligent act must be limited in order to avoid an intolerable burden on society. *Elden v. Sheldon*, 46 Cal.3d 267, 250 Cal.Rptr. 254, 258–59, 758 P.2d 582, 586 (1988); *Bily*, 11 Cal.Rptr.2d at 68, 834 P.2d at 762.

Public policy considerations weigh against imposing a duty on all counselors to prevent the suicides of noncustodial clients, because the imposition of such a broad duty could have a deleterious effect on counseling in general. *Cf. Nally*, 253 Cal.Rptr. at 108–09, 763 P.2d at 959; *Bellah*, 146 Cal.Rptr. at 539. For example, a duty to prevent suicides would force a counselor (e.g., a veterans services counselor, a spousal abuse counselor, a chemical dependency counselor, a marriage counselor, a priest, a rabbi, a minister, a native Hawaiian kahuna, or even a telephone hotline counselor) to breach counselor-client confidentiality and disclose a client's suicidal disposition to all of the client's immediate relatives, regardless of whether the client would prefer to keep such sensitive and potentially embarrassing information confidential. Furthermore, the counselor would also have to immediately pass on this information to professional therapists, which would cause those people most in need of counseling to fear that their private disclosures could subject them to involuntary commitment in psychiatric facilities. *Nally*, 253 Cal.Rptr. at 108–09, 763 P.2d at 959.

The Hawai'i legislature has indicated that, with respect to government's involvement in mental health care, victims of emotional disorders should be "treat[ed] and rehabilitate[d] ... in the *least restrictive* and most therapeutic *environment possible*." HRS § 334–2 (1993) (emphases added). Were it not for the assurance of confidentiality in the counselor-client relationship, many in need of counseling would be reluctant to even seek counseling, and those who do seek counseling under such circumstances would probably be deterred from fully disclosing their problems to their counselors. *Cf. Bellah*, 146 Cal.Rptr. at 539.

Furthermore, there is authority suggesting that health care workers can be subject to civil liability by disclosing confidential information to third parties. For example, an appellate court in North Carolina acknowledged that a woman could maintain a cause of action against a marital and family counselor for his allegedly unauthorized disclosure of confidential information about her to medical doctors. *Watts v. Cumberland County Hospital System, Inc.*, 75 N.C.App. 1, 330 S.E.2d 242, 248–50 (1985), *review denied*, 314 N.C. 548, 335 S.E.2d 27 (1985), *reversed in part on other grounds*, 317 N.C. 321, 345 S.E.2d 201 (1986).

Various theories have been suggested as a basis for the cause of action, including invasion of privacy, breach of implied contract, breach of fiduciary duty or duty of confidentiality, and medical malpractice.

Courts considering the issue have not agreed upon the proper characterization of the cause of action and, in some cases, have held that liability may be imposed under more than one theory.

*Watts,* 330 S.E.2d at 248; *see also, Humphers v. First Interstate Bank,* 298 Or. 706, 696 P.2d 527 (1985) (affirming that a biological mother had "stated a claim for damages in alleging that her former physician revealed her identity to a daughter whom she had given up for adoption"); *Alberts v. Devine,* 395 Mass. 59, 479 N.E.2d 113, 120 (1985) (holding that a duty of confidentiality arises from the psychiatrist-patient relationship "and that a violation of that duty, resulting in damages, gives rise to a cause of action sounding in tort against the physician"), *cert. denied, Carroll v. Alberts,* 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985); *Vassiliades v. Garfinckel's, Brooks Bros.,* 492 A.2d 580, 592 (D.C.1985) ("We hold that the breach of a physician-patient relationship [by disclosing confidential information] is an actionable tort."); *MacDonald v. Clinger,* 84 A.D.2d 482, 446 N.Y.S.2d 801, 802 (1982) (holding that a psychiatrist's wrongful disclosure of confidential information to a patient's wife "[wa]s a breach of the fiduciary duty of confidentiality and g[ave] rise to a cause of action sounding in tort"); *Doe v. Roe,* 93 Misc.2d 201, 400 N.Y.S.2d 668, 674 (Sup.1977) ("a physician, who enters into an agreement with a patient to provide medical attention, impliedly covenants to keep in confidence all disclosures made by the patient concerning the patient's physical or mental condition as well as all matters discovered by the physician in the course of examination or treatment"); *Horne v. Patton,* 291 Ala. 701, 287 So.2d 824, 830 (1973) ("Unauthorized disclosure of intimate details of a patient's health may amount to unwarranted publicization of one's private affairs with which the public has no legitimate concern such as to cause outrage, mental suffering, shame or humiliation to a person of ordinary sensibilities."); *Runyon v. Reid,* 510 P.2d 943, 950–51 (Okla.1973) (suggesting that a psychiatrist might be liable where the psychiatrist "negligently or intentionally discloses confidential communications made to him by the patient in situations where it is foreseeable that the disclosure might cause the patient to harm himself, and the disclosure is a decisive factor in the decedent's decision to commit suicide"); *Hammonds v. Aetna Casualty & Surety Co.,* 243 F.Supp. 793, 802 (N.D.Ohio 1965) ("The unauthorized revelation of medical secrets, or any confidential communication given in the course of treatment, is tortious conduct which may be the basis for an action in damages."). Requiring counselors to breach counselor-client confidentiality would force counselors to incur a greater risk of civil liability, which, in turn, might discourage people from serving as counselors. Moreover, like the *Nally* court, we are not familiar with the value and availability of insurance for counselors' liability arising out of a duty to prevent the suicides of noncustodial clients, because few such cases have been filed against counselors. *See Nally,* 253 Cal. Rptr. 97, 763 P.2d at 960.

Neither the legislature nor the courts in Hawai'i have ever imposed a legal obligation on persons to take affirmative steps to prevent the suicide of someone who was not in their custody. In an analogous situation, while addressing the issue of whether absolute judicial immunity protected a court-appointed psychiatrist from liability, we noted our reluctance to impose a duty upon a psychiatrist to prevent noncustodial patients from causing harm to third-parties:

There is much uncertainty in the diagnosis and treatment of mental illness and in the prediction of future behavior. As the court stated in *Hicks v. United States,* 511 F.2d 407, 415 (D.C.Cir.1975):

A claim of negligence must be considered in light of the elusive qualities of mental disorders and the difficulty of analyzing and evaluating them. Exactitude is often impossible. The Supreme Court has recently noted "the uncertainty of diagnosis in this field and the tentativeness of professional judgment." Error and uncertainty considered alone must often be accepted without labeling them negligence. (Citations omitted.)

We must consider appellants' allegations in light of the elusive qualities of mental health diagnosis and treatment.

We must also evaluate appellants' allegations in light of the goal of treatment, recovery and rehabilitation of those afflicted with a mental disease, defect or disorder. A consequence of imposing liability on a doctor was recognized by the court in *Taig v. State,* 19 App.Div.2d 182, 241 N.Y.S.2d 495, 496–97 (1963), which stated: "If a liability were imposed on the physician or the State each time the prediction of future course of mental disease was wrong, few releases would ever be made and the hope of recovery and rehabilitation of a vast number of patients would be impeded and frustrated."

*Seibel v. Kemble,* 63 Haw. 516, 521, 631 P.2d 173, 176–77 (1981) (footnote omitted). Likewise in the instant case, we are reluctant to impose a new duty on counselors when to do so would profoundly affect mental health counseling, which, like psychiatric care, is a professional realm beyond the expertise of the judiciary.

Imposing a duty on counselors to prevent the suicides of noncustodial clients by breaching counselor-client confidentiality would be contrary to the trend in the Hawai'i legislature to allow adult persons greater freedom in making health care decisions that affect only themselves (as opposed to third persons). With respect to mental health care, the Hawai'i legislature has specifically declared "that all persons have the *fundamental right* to control decisions relating to their own medical care, including the decision to *accept or refuse medical treatment,* including the administration of psychotropic drugs, by a health care provider for a *psychotic condition.*" HRS § 327F–1 (1993) (emphases added). This fundamental decision-making right with respect to one's own health care also extends to "the decision to have medical or surgical means or *procedures calculated to prolong their lives . . . withheld,*

or *withdrawn.*" HRS § 327D–1 (1993) (emphases added).

Forcing counselors to breach counselor-client confidentiality would also be contrary to the trend in the Hawai'i legislature to protect communications from disclosure that are related to mental health counseling. For example, Rule 504.1 of the Hawai'i Rules of Evidence (HRE) protects confidential communications between psychologists and their clients when such communications are made for the purpose of counseling:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential *communications made for the purpose of counseling* or psychotherapy with respect to behavioral problems, including substance addiction or abuse, among oneself, the client's psychologist, and *persons who are participating in the counseling* or psychotherapy under the direction of the psychologist, *including members of the client's family.*

HRE Rule 504.1(b) (1993) (emphases added).

In addition to holding "that confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence" (FRE),[3] the United States Supreme Court recently had "no hesitation in concluding . . . that the federal privilege should also extend to confidential communications made to licensed social workers in the course of psychotherapy." *Jaffee v. Redmond,* — U.S. ——, ——, 116 S.Ct. 1923, 1931, 135 L.Ed.2d 337 (1996) (holding that the conversations between a defendant and her licensed social worker and the notes taken during their counseling sessions were privileged pursuant to FRE Rule 501).

The reasons for recognizing a privilege for treatment by psychiatrists and psycholo-

---

**3.** Rule 501 of the Federal Rules of Evidence states as follows:

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law

as they may be interpreted by the courts of the United States in light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

gists apply with equal force to treatment by a clinical social worker.... Today, social workers provide a significant amount of mental health treatment. Their clients often include the poor and those of modest means who could not afford the assistance of a psychiatrist or psychologist, but whose counseling sessions serve the same public goals. Perhaps in recognition of these circumstances, the vast majority of States explicitly extend a testimonial privilege to licensed social workers. We therefore agree with the Court of Appeals that drawing a distinction between the counseling provided by costly psychotherapists and the counseling provided by more readily accessible social workers serves no discernible purpose.

*Jaffee*, —— U.S. at —— ——, 116 S.Ct. at 1931–32 (citations, footnotes, brackets and quotation marks omitted).

Indeed, the Hawai'i legislature has specifically decided that communications between a counselor and a victim of sexual assault, domestic abuse or child abuse are confidential and "privileged" to the same degree as psychotherapist-patient communications:

> A victim has a *privilege* to refuse to disclose and to *prevent any other person from disclosing confidential communications* made to a victim counselor for the purpose of counseling or treatment of the victim for the emotional or psychological effects of sexual assault, domestic violence, or child abuse or neglect, and to refuse to provide evidence that would identify the name, location, or telephone number of a safe house, abuse shelter, or other facility that provided temporary emergency shelter to the victim.

HRE Rule 505.5(b) (1993) (emphases added).

This rule, which resembles victim-counselor privilege provisions now in existence in some twenty states, e.g., Cal. Evid.Code §§ 1035 through 1037.7 (1992), encourages and protects the counseling of emotionally distressed victims of violent crimes by according privilege status to confidential communications made in the course of the counseling process. In adopting a similar law, N.J. Stat. Ann. § 2A:84A–22.13 and 22.15 (1991), the New Jersey Legislature declared that the "counseling of victims is most successful when the victims are assured [that] their thoughts and feelings will remain confidential and will not be disclosed without their permission." The present provision proceeds upon just such a policy basis.

Commentary to HRE Rule 505.5 (1993).

Furthermore, because many members of the clergy (e.g., priests, ministers, rabbis, and native Hawaiian kahunas) serve as counselors, such as the "pastoral counselors" in *Nally,* 253 Cal.Rptr. 97, 763 P.2d 948, we note that the Hawai'i legislature has indicated that communications with members of the clergy are confidential and "privileged":

> Rule 506 Communications to clergy....
>
> ....
>
> (b) General rule of privilege. A person has a privilege to refuse to disclose and to prevent another from disclosing a confidential communication by the person to a member of the clergy in the latter's professional character as spiritual advisor.
>
> (c) Who may claim the privilege. The privilege may be claimed by the communicant or by the communicant's guardian, conservator, or personal representative. The member of the clergy may claim the privilege on behalf of the communicant. Authority to do so is presumed in the absence of evidence to the contrary.

Haw. R. Evid. 506 (1993).

The present rule accords generally with the prior statute but broadens the scope of the privilege slightly in two particulars. Under the prior statute the privilege was limited to confidential communications made "according to the uses of the church or religious denomination to which [the clergyman] belongs." There seems no good reason to limit the privilege in this way so long as confidentiality was intended by the communicant. The present rule clarifies that uncertain point, granting the privilege to all confidential communications made to the clergyman in his professional capacity as a spiritual advisor. In addition, the privilege is extended to cover confidential communications to one who is not a clergyman if the person making the

communication reasonably believes that he is.

Commentary to Haw. R. Evid. 506 (1993). Thus, the imposition of a duty on counselors to prevent the suicides of noncustodial clients would constitute a broad public policy decision with respect to mental health care, personal autonomy and confidential communications which, under these circumstances, is best left to the branch of government vested with the authority and fact-finding ability to make such broad public policy decisions, namely the Hawai'i legislature.

We are aware of one instance in which a court held that "school counselors [at a middle school] have a duty to use reasonable means to attempt to prevent a [student's] suicide when they are on notice of a child or adolescent student's suicidal intent". *Eisel v. Board of Education*, 324 Md. 376, 597 A.2d 447, 456 (1991). In addition, another court held that a high school teacher had a duty to exercise reasonable care in preventing a high school student's suicide. *Brooks v. Logan*, 127 Idaho 484, 903 P.2d 73, 79 (1995). However, both *Eisel* and *Brooks* are clearly distinguishable from the instant case. While the suicide victim in the instant case, Perreira, was an independent, forty-two year old adult man, "Eisel's claim involve[d] suicide by an adolescent[,]" *Eisel*, 597 A.2d at 451, and *Brooks* involved "the suicide of fourteen-year-old Jeffrey Brooks." *Brooks*, 903 P.2d at 75. Thus, while Perreira had the freedom, as an adult, to enter or leave the Veterans Administration Clinic and the Office of Veterans' Services, accepting or refusing medical treatment as he pleased, the suicide victims in *Eisel* and *Brooks* were children under the care, protection, control and supervision of their respective schools, a role which the *Brooks* court "described as one *in loco parentis.*" *Brooks*, 903 P.2d at 79 (emphases in original). Likewise, the *Eisel* court recognized "the doctrine that the relation of a school vis a vis a pupil is analogous to one who stands *in loco parentis*, with the result that a school is under a special duty to exercise reasonable care to protect a pupil from harm." *Eisel*, 597 A.2d at 451–52 (emphases added; quotation marks and citations omitted).

The *Eisel* and *Brooks* courts also based their holdings on statutes that imposed a duty on schools to protect children from suicides. In *Eisel*, the Maryland "General Assembly ha[d] made it quite clear [through the Youth Suicide Prevention School Programs Act] that prevention of youth suicide is an important public policy, and that local schools should be at the forefront of the prevention effort." *Eisel*, 597 A.2d at 453. In a clear reference to the distinction between adults and children, the *Eisel* court noted that "[t]he Act d[id] not view ... troubled children as standing independently, to live or die on their own." *Id.* at 454. Likewise in *Brooks*, the Idaho "legislature [had] enacted I.C. § 33–512(4)," which "created a statutory duty ... requir[ing] a school district to act reasonably in the face of foreseeable risks of harm" and "to act affirmatively to prevent foreseeable harm to its students." *Brooks*, 903 P.2d at 79. In contrast to school children, adults such as Perreira have much greater personal autonomy and decision-making freedom with respect to their own health care. *See, e.g.*, HRS § 327F–1 (1993) ("[A]ll persons have the fundamental right to control decisions relating to their own medical care, including the decision to accept or refuse medical treatment, including the administration of psychotropic drugs, by a health care provider for a psychotic condition."); HRS § 327D–1 (1993) (The fundamental decision making right with respect to one's own health care also extends to "the decision to have medical or surgical means or procedures calculated to prolong their lives ... withheld, or withdrawn.").

Indeed, if we were to impose a duty on counselors to prevent the suicides of non-custodial adults such as Perreira, we would have to address whether such government intervention violates the constitutional rights of adult persons who wish to commit suicide. *Cf. State v. Cotton*, 55 Haw. 138, 139, 516 P.2d 709, 710 (1973) ("We accept ... the fundamental tenet that the relationship between the individual and the state leaves no room for regulations which have as their purpose and effect solely the protection of the individual from his folly."). However, we need not resolve any such constitutional im-

plications, because we decline to impose such a duty today.

> Where a duty assigned to a public employee is ineptly performed, but the risk of harm to individuals in the community is not increased thereby as compared to that which would have existed had no governmental action been attempted, there may be strong policy considerations against recognizing governmental tort liability for the harms which the public employee failed to prevent.

*Ajirogi v. State*, 59 Haw. 515, 522 n. 3, 583 P.2d 980, 985 n. 3 (1978) (holding that the state did not owe a duty of care to third parties whom a mentally disabled state hospital resident had injured by escaping, stealing a car, and crashing the car head-on into them, despite the state's knowledge of the mentally disabled state hospital resident's past propensity for dangerously operating automobiles). Even assuming, arguendo, that Corregedore failed to perform his duty as a public employee by not informing the proper professional therapists and Perreira's immediate relatives about Perreira's suicidal disposition, Corregedore's failure to do so did not increase the risk that Perreira would commit suicide as compared to the risk which would have existed had no government action on the part of the Office of Veterans' Services been attempted. As an independent, forty-two year old adult, Perreira had the freedom of choice to seek or avoid counseling. Corregedore and the State did not have custody nor control over Perreira, and thus, they did not share a special relationship sufficient to impose a duty of care on Corregedore to prevent Perreira's suicide. Furthermore, there are strong public policy considerations that weigh against recognizing tort liability for Corregedore's failure to prevent Perreira's suicide. We hold that Corregedore did not have a duty to prevent Perreira's suicide.

---

**4.** Restatement (Second) of Torts § 285 (1965) provides in relevant part:

§ 285. How Standard of Conduct is Determined.

The standard of conduct of a reasonable man [or woman] may be

### B. *HRS Chapter 363, Veterans Rights and Benefits, Does Not Create A Statutory Duty Of Care.*

Although it is not explicitly stated, Appellants also seem to advance an argument that HRS Chapter 363 creates a statutory duty of care. Duty in a negligence action may be defined by common law or by statute.[4] "[T]he standard of conduct may be defined and established by a legislative enactment which lays down requirements of conduct, and provides expressly or by implication that a violation shall entail civil liability in tort." Restatement (Second) of Torts § 285 comment b (1965). Put differently, "[w]hen a statute provides that under certain circumstances particular acts shall or shall not be done, it may be interpreted as fixing a standard ... from which it is negligence to deviate." William L. Prosser, *Prosser & Keeton on the Law of Torts* § 36 at 220 (5th ed. 1984) (footnote omitted). Thus, the key words are that the statute must specify or imply standards or "requirements of conduct" that will create civil liability.

This court applied the foregoing principles in *Hulsman v. Hemmeter Development Corp.*, 65 Haw. 58, 647 P.2d 713 (1982), in which we considered the liability of a seller of firearms who had sold a gun to a mentally deranged individual. The plaintiff asserted that the seller was liable because HRS § 134-9, governing the licensure of gun owners, imposed a duty of care on sellers of firearms. *Hulsman*, at 65, 647 P.2d at 719. This statute made "it a criminal offense for a person to possess a firearm without a license or permit." *Id.* at 66, 647 P.2d at 719 (footnote omitted).

> However, by its terms, the statute does not impose a duty on the seller of a firearm in the sale to a mentally deranged person or one who is adjudged insane. The underlying legislative history does not manifest an intent on the part of the legislature to impose a duty of care on the seller of a firearm through the statute. Thus, a viola-

---

(a) established by a legislative enactment or administrative regulation which so provides, or
(b) adopted by the court from a legislative enactment or an administrative regulation which does not so provide, ....

tion of this statutes [sic] does not impose a duty … from which an actionable claim can be maintained.

*Id.* at 66–67, 647 P.2d at 720 (citations omitted).

■■■■■ If a statute "contains no express provision that its violation shall result in tort liability, and no implication to that effect, the court may, and in certain types of cases customarily will, adopt the requirements of the enactment as the standard of conduct necessary to avoid liability for negligence." Restatement (Second) of Torts § 285 comment c (1965). Courts may adopt the requirements of a statute as the standard of care when the purpose of the statute is to "protect a class of persons which includes the one whose interest is invaded[.]" Restatement (Second) of Torts § 286(a) (1965).[5] When there is no provision for civil liability, § 286 applies to statutes which

> provide only for criminal liability, and not for civil liability; or in rare instances, it may merely prohibit certain conduct, and contain no provision for any liability at all. In such cases, the initial question is whether the legislation or regulation is to be given any effect in a civil suit. Since the legislation has not so provided, the court is under no compulsion to accept it as defining any standard of conduct for purposes of a tort action.

Restatement (Second) of Torts § 286 comment d (1965). In sum, a statute that is meant to protect a class of persons may be the basis for a standard of care when the statute provides for criminal liability or, less often, when it prohibits or proscribes conduct.

HRS Chapter 363, Veterans Rights and Benefits, has a variety of purposes. For example, HRS § 363–3 (1993) provides that the Office of Veterans' Services shall: maintain and supervise a center for veterans, their families and dependents providing information and referral for services, assis-

tance, or benefits; cooperate with other agencies in the community to coordinate available services; assemble, analyze, compile, and disseminate factual up-to-date information with respect to available benefits, rights and services, as well as information about the structure, functions, and area of service of any agencies and organizations participating in the veterans' assistance program; cooperate with federal departments and other agencies that administer veterans' rights and benefits; and compile and submit a yearly report on the activities, operations, disbursements and expenditures of the Office of Veterans' Services to the Governor. HRS § 363–3.5 (1993) establishes a policy advisory board for veterans' services. HRS §§ 363–4 and 363–5 (1993) establish veterans' cemeteries on all of the islands and set up councils on each island to maintain the cemeteries and provide for the interment of the remains of Hawai'i's veterans.

HRS Chapter 363 does not specify standards of conduct on the part of Veterans' Services Counselors necessary to avoid liability for negligence, nor can such standards of conduct be inferred from the chapter's language. Moreover, the legislative history reveals no intent to create a standard of care on the part of Veterans' Services Counselors. Although HRS Chapter 363 benefits a class of citizens, it is not penal in nature and does not proscribe conduct. Therefore, we hold that HRS Chapter 363 does not create a statutory duty of care on the part of Veterans' Services Counselors.

## IV. CONCLUSION

For the foregoing reasons, we hold that Appellees did not have a duty to prevent Perreira's suicide, and we affirm the circuit court's summary judgment in favor of Appellees.

LEVINSON, Justice, in which KLEIN, Justice, joins, dissenting.

I agree with the majority that the presence of a legally cognizable "special relation-

5. Restatement (Second) of Torts § 286(a) (1965) provides in relevant part:
 § 286. When Standard of Conduct Defined by Legislation or Regulation Will Be Adopted
 The Court may adopt as the standard of conduct of a reasonable man [or woman] the

requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part
 (a) to protect a class of persons which includes the one whose interest is invaded,....

ship" between an "actor" and an individual facing harm is a precondition to the existence of a duty to take reasonable action to prevent the harm. I disagree, however, for at least four reasons, with the calculus employed by the majority in this case in determining whether Perreira and Corregedore shared such a "special relationship."

## I. PRELIMINARY RUMINATIONS

First, the majority places far too much emphasis on the lack of a "custodial" relationship between Corregedore and Perreira. The majority asserts that its "review of cases in other jurisdictions advances only one type of special relationship that consistently imposes a duty on an actor to prevent another's suicide, namely a relationship predicated on a custodial relationship." Majority opinion at 160, 925 P.2d at 330. In support of its assertion, the majority cites *Haworth v. State*, 60 Haw. 557, 592 P.2d 820 (1979), and *Figueroa v. State*, 61 Haw. 369, 604 P.2d 1198 (1979), for the Hawai'i rule that "a state, by reason of the special relationship created by its custody of [a] prisoner [or a juvenile in a youth correctional facility], is under a duty to the prisoner to take reasonable action to protect the prisoner against unreasonable risk of physical harm." Majority opinion at 159, 161, 925 P.2d at 329, 331 (emphasis omitted) (some brackets added and some omitted); *Haworth*, 60 Haw. at 563, 592 P.2d at 824. The majority further cites several cases from other jurisdictions, at 160–161, 925 P.2d at 330–331 of its opinion, that are consistent with the proposition, articulated in *City of Belen v. Harrell*, 93 N.M. 601, 603 P.2d 711, 713 (1979), and with which I agree, that "[w]hen one party is in the custodial care of another, as in the case of a jailed prisoner, the custodian has the duty to exercise reasonable and ordinary care for the protection of the life and health of the person in custody." Majority opinion at 161, 925 P.2d at 331 (internal quotation marks omitted).

Beyond perceiving one context in which the traditional restrictive rule has consistently been relaxed, these cases neither speak to nor preclude other contexts in which a similar duty should be recognized. The majority correctly acknowledges that a custodial relationship is simply one example in a list of "Special Relations Giving Rise to Duty to Aid or Protect" described in the Restatement (Second) of Torts § 314A (1965), *see* majority opinion at 159 & n. 2, 925 P.2d at 329 & n. 2, but fails to concede either: (1) that "[s]ection 314A of the *Restatement* sets forth a *non-exclusive* list of special relationships upon which a court may find a duty to protect," *Doe v. Grosvenor Properties (Hawaii) Ltd.*, 73 Haw. 158, 163, 829 P.2d 512, 515 (1992) (citing Restatement (Second) of Torts § 314A comment b (1965)) (emphasis added); *see also Maguire v. Hilton Hotels Corp.*, 79 Hawai'i 110, 113, 899 P.2d 393, 396 (1995) ("In determining whether such a [special] relationship exists, this court looks to section 314A of the Restatement (Second) of Torts, which sets forth a *non-exclusive* list of 'special relationships' upon which a court may find a duty to protect." (Citations omitted and emphasis added)); or (2) that "[t]he law appears ... to be working slowly toward a recognition of the duty to aid or protect in any relation of dependence or of mutual dependence." Restatement (Second) of Torts § 314A comment b (1965).[1]

---

1. In this connection, I submit that the majority's holding in this case is utterly irreconcilable with the key holding in this court's recent decision in *Touchette v. Ganal*, 82 Hawai'i 293, 922 P.2d 347 (1996). In *Touchette*, one of the codefendants, Orlando Ganal (Ganal), intentionally set fire to two residents, resulting in the deaths of several of the plaintiffs (whose claims were asserted by the coplaintiff special administratrix) and catastrophic injury to the coplaintiff, Wendy Touchette, suing in her individual capacity. The plaintiffs' complaint alleged, *inter alia*, that (1) another codefendant, Ganal's wife, Mabel, "had the opportunity and ability to warn [the plaintiffs] of [Ganal's] severe and extreme emotional and mental distress and depression, and/or instability and/or propensity and/or tendency to cause injury, even death, but, nevertheless, negligently failed to do so," and that (2) "[e]ven though [Mabel] knew or should have known that [Ganal] was in need of supervision for the protection of others, [Mabel], nevertheless, failed to exercise reasonable care and/or to take other appropriate actions to prevent the injury and death to the [plaintiffs]." *Touchette*, at 295, 922 P.2d at 349. The circuit court granted Mabel's motion to dismiss, ruling that "pursuant to § 315 Restatement of Torts (Second) and [Hawai'i] case law[,] [Mabel] had no duty to control the conduct of [Ganal][,] as no required 'special relationship' was

Inasmuch as the section 314A list of "special relationships" is non-exclusive, the majority is not being completely forthcoming when it asserts that lack of custody is an

alleged or shown at hearing." *Id.* at 293, 922 P.2d at 351 (some brackets in original and some added).

On appeal, we vacated the circuit court's order and remanded the matter for further proceedings, *id.* at 294, 304, 922 P.2d at 348, 358, pursuant to the following rationale:

Sections 314A through 325 address special applications of the general principle set forth in section 314. Comment a to section 314 provides:

The general rule stated in this Section should be read together with other sections which follow. Special relations may exist between the actor and the other, as stated in § 314A, which impose upon the actor the duty to take affirmative precautions for the aid or protection of the other.... The actor's prior conduct, whether tortious or innocent, may have created a situation of peril to the other, as a result of which the actor is under a duty to act to prevent harm.... *The actor may have committed himself [or herself] to the performance of an undertaking, gratuitously or under contract, and so may have assumed a duty of reasonable care for the protection of the other,* or even a third person....

. ....

Section 314A contains a caveat stating that "[t]he Institute expresses no opinion as to whether there may not be other relations which impose a similar duty[,]" and this court has also recognized that the list of relationships delineated in section 314A is not exclusive or exhaustive. Moreover, comment (b) to section 314A provides:

... The duties stated in this Section arise out of special relations between the parties, which create a special responsibility, and take the case out of the general rule. The relations listed are not intended to be exclusive, and are not necessarily the only ones in which a duty of affirmative action for the aid or protection of another may be found.... The law appears ... to be working slowly toward a recognition of the duty to aid or protect in any relation of dependence....

....

We ... expressly recognize the duty set out in Restatement (Second) of Torts §§ 302, 302A and 302B. *We therefore hold that: (1) a negligent act or omission may be one which involves an unreasonable risk of harm to another through* either (a) the continuous operation of a force started or continued by the act or omission, or (b) *the foreseeable action of the other,* a third person, an animal or a force of nature; *(2) an act or omission may also be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the negligent or reckless conduct of the other* or a third person; *and (3) an act or an omission also may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other* or a third person

*which is intended to cause harm,* even though such conduct is criminal.
*Id.* at 298–99, 303, 922 P.2d at 352–53, 357 (citations omitted) (brackets in original) (emphases added).

° The majority's retreat from this court's expansive "duty" analysis in *Touchette* is baffling, unjustified, and cruel to the plaintiffs in this case, and its attempt to argue the irrelevance of *Touchette* to the present appeal, *see* majority opinion at 160–162, 925 P.2d at 330–332, fails completely to persuade me to the contrary. My so-called "gratuitous citation" of *Touchette* does *not* "reflect[ ] a fundamental misunderstanding and misinterpretation of our analysis and holdings in that case." Majority opinion at 161, 925 P.2d at 331. That *Touchette* is *factually* distinguishable from the present case is obvious from my recitation *supra* in this footnote, speaks for itself, and is beside the point. As the majority itself recognizes, however, " '[a] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that no relief can be granted under any set of facts that can be proved in support of its allegations[.]' " Majority opinion at 162, 925 P.2d at 332 (quoting *Touchette*, at 303, 922 P.2d at 357 (citations omitted)) (some brackets in original and some added). Although the majority's holding that "Corregedore did not have a duty to prevent Perreira's suicide," majority opinion at 172, 925 P.2d at 342, distorts the nature of the duty the acknowledgment of which the plaintiff urge in this case, *see infra,* its clear implication is that—in the majority's view—the plaintiffs' claims for relief, "beyond doubt," cannot be granted under any set of facts that can be proved in support thereof. It is in this respect that *Touchette* is directly relevant.

The majority claims that "our holding in *Touchette* was premised" on "the common law distinction between 'nonfeasance' and 'misfeasance.' " Majority opinion at 162, 925 P.2d at 332. "*[N]onfeasance* implies the failure to act where a duty to act existed." *A Dictionary of Modern Legal Usage* 595 (2d ed. 1995) (emphasis in original). "*[M]isfeasance* refers to an otherwise lawful act performed in a wrongful manner." *Id.* at 544 (emphasis in original). If *Touchette* was premised on this distinction, then I am at a loss to explain why *Touchette* expressly held, *inter alia,* that liability—based on the breach of a duty owed by an "actor" (*i.e.,* a defendant) to "another"—may arise out of "a negligent ... omission ... involv[ing] an unreasonable risk of harm to another through ... the *foreseeable* action of the other," under circumstances where the actor's "*omission* ... involves an unreasonable risk of harm to another through the conduct of the other ... which is intended to cause harm[.]" *Touchette*, at 303, 922 P.2d at 357 (emphases added). Even though the quoted holding may not have been necessary to the resolution of the dispute before it, the fact remains that the *Touchette* court held what it held.

absolute bar to the establishment of such a special relationship. For example, the majority suggests that "[a]n exception to th[e] rule [*i.e.*, that there is no cognizable claim for relief sounding in negligence in connection with the suicide of another] allows the imposition of a duty to prevent suicide[,] but *only* in a custodial situation where suicide is foreseeable." Majority opinion at 160, 925 P.2d at 330 (citations and quotation marks omitted) (emphasis added). The majority further maintains that "we have followed the Restatement (Second) of Torts § 314A(4) and recognized a reasonable duty of care to prevent suicide *only* on the part of a defendant who had actual custody of a suicidal person." *Id.* at 160, 925 P.2d at 330 (citing *Figueroa*, 61 Haw. at 376–80, 604 P.2d at 1202–04) (emphasis added). Thus, the majority argues that "the Restatement (Second) of Torts § 314A(4) ... weigh[s] against creating ... a duty [in this case]." *Id.* at 161, 925 P.2d at 337.

The majority seems to misapprehend the meaning of "non-exclusive." "'Exclusive' means 'with no exceptions' and should be used carefully," *A Dictionary of Modern Legal Usage* 336 (2d ed. 1995), or "not admitting of something else," or "limited to the object or objects designated." *Webster's Encyclopedic* Unabridged Dictionary of the English Language 497 (1989). A "non-exclusive" list, therefore, *is not* limited to the object or objects designated and *is* subject to exception and *does* admit of something else. I fail to comprehend how the recognition of a duty in one context, in and of itself, can "weigh against" the recognition of another duty in a different context, unless the two are mutually exclusive. Accordingly, the absence of a custodial relationship between Corregedore and Perreira does not end—but merely begins—a complete and cogent analysis of the dispositive issue presented in this appeal.

2. Hawai'i case law indicates that the underlying rationale for the custody exception is closely linked to foreseeability. The majority quotes *Seibel v. City and County of Honolulu*, 61 Haw. 253,

Second, the majority overlooks the salient fact that distinguishes the present case from every decision cited in its opinion—the clear "foreseeability" of Perreira's suicide, which there is no dispute in the record that Corregedore fully recognized and, by his own conduct (*i.e.*, telephoning Perreira's social worker), took at least some action to seek to prevent. *Cf., e.g., Seibel v. Kemble*, 63 Haw. 516, 521, 631 P.2d 173, 176–77 (1981) ("There is much uncertainty in the diagnosis and treatment of mental illness and in the prediction of future behavior."), cited at 168, 925 P.2d at 338 of the majority opinion; *Cygan v. City of New York*, 165 A.D.2d 58, 566 N.Y.S.2d 232, 238 (1991) (in wrongful death action against the city for the suicide of a police officer, "[t]he record ... contain[ed] not one scintilla of evidence either to indicate that decedent was suicidal or that the [Police] Department should somehow have anticipated that he was"), cited at 160, 925 P.2d at 330 of the majority opinion; *Krieg v. Massey*, 239 Mont. 469, 781 P.2d 277, 279 (1989) ("Plaintiff failed to present any evidence to show that [the decedent's] suicidal tendencies had been communicated to [the defendant].”), cited at 161, 925 P.2d at 331 of the majority opinion; *see also Bogust v. Iverson*, 10 Wis.2d 129, 102 N.W.2d 228, 230 (1960) ("[T]here is no allegation of fact that would have apprised the defendant, as a reasonably prudent man, that [the decedent] had [suicidal] tendencies.").

Although I agree that "[m]ere foreseeability of the harm or knowledge of the danger[ ] is insufficient to create a legally cognizable special relationship giving rise to a legal duty to prevent harm," *Nally v. Grace Community Church*, 47 Cal.3d 278, 253 Cal.Rptr. 97, 108, 763 P.2d 948, 959 (1988), *cert. denied*, 490 U.S. 1007, 109 S.Ct. 1644, 104 L.Ed.2d 159 (1989), *see also* majority opinion at 168, 925 P.2d at 338, even the majority impliedly admits that "foreseeability" nevertheless weighs heavily in traditional duty analysis. *See* majority opinion at 160, 925 P.2d at 330.[2] *See also Maguire*, 79 Hawai'i at 114, 899 P.2d

260, 602 P.2d 532, 537–38 (1979), *inter alia*, for the proposition that

[t]he basis for imposing a duty on the parent, master or institutional custodian to control the

at 397 ("[U]nder the business visitor relationship exception [set forth in section 314A], a landholder only has a duty to protect ... if such acts are *reasonably foreseeable.*" (Emphasis added.)); (*McLaughlin v. Sullivan,* 123 N.H. 335, 461 A.2d 123, 127 (1983) ("*Duty and foreseeability are inextricably bound together.* The risk reasonably to be perceived defines the duty to be obeyed.") (Citation and internal quotation marks omitted.) (Emphasis added.)); *Tarasoff v. Regents of Univ. of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 22, 551 P.2d 334, 342 (1976) ("*The most important .. . consideration[ ] in establishing duty is foreseeability.* As a general principle, a defendant owes a duty of care to all persons who are *foreseeably* endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous.") (Citations and internal quotation marks omitted.) (Emphases added.) Thus, this court—as well as every jurisdiction that the majority cites to support its decision not to recognize a legally cognizable duty in the present case—considers, as a significant factor, the presence or absence of any evidence in the record before it of the "foreseeability" of the alleged harm for purposes of determining the existence of a legal duty.

Third, the majority artificially inflates the significance of the "actor's" formal training and professional licensing. These qualifications are clearly relevant where there is a genuine issue of material fact regarding the "foreseeability" of preventable harm. *See, e.g., Cygan,* 566 N.Y.S.2d at 238 ("[L]iability exists for the failure to prevent a suicide ... where an institution or mental health professional with sufficient expertise to detect suicidal tendencies and with the control necessary to care for the person's well-being fails to take such steps."). The "foreseeability" of Perreira's suicide in the present case, however, was completely undisputed. Corregedore cannot, and, by virtue of his own conduct,

does not, assert that he had any doubt as to the significance of Perreira's expressed intention.

Thus, the status of Corregedore's formal training and licensing is relevant in the present case only to the question whether he acted reasonably to seek to prevent[3] the "foreseeable" harm, of which he had actual notice. *See Bogust,* 102 N.W.2d at 230 (holding, in action against a school guidance counselor, that "as a teacher [the defendant] cannot be charged with the same degree of care based on [knowledge of the suicidal tendencies of the decedent] as a person trained in medicine or psychiatry could exercise"); *Nally,* 253 Cal.Rptr. at 118, 763 P.2d at 968–69 (Kaufman, J., concurring) ("As in every negligence case, the precise nature of the defendant's duty will necessarily vary with the facts. . . . The scope of the duty contemplated is commensurate with the nontherapist counselor's background and stated mission.") (Citation omitted.); *Brooks v. Logan,* 127 Idaho 484, 903 P.2d 73, 82–83 (1995) (Young, J., concurring and dissenting) ("The distinguishing factual difference between *Eisel[ v. Board of Education,* 324 Md. 376, 597 A.2d 447 (1991) ], where a duty was found to exist, and *McLaughlin* and *Bogust,* where no duty was found to exist, is that in *Eisel,* there was direct evidence that suicide was planned by the decedent in question and there was no need for special training to foresee that the decedent intended to commit suicide; while in *McLaughlin* and *Bogust,* the suicide was held to be unforeseeable and no duty to take affirmative action to prevent suicide existed because each of the defendants lacked the special training required to detect mental illness and/or the potential for suicide to foresee that the deceased intended suicide."). That status, however, merely begs the foundational question as to whether Corregedore was subject to a duty to take *some* action to prevent the harm.

---

conduct of a child, servant or ward is that, because of the relationship between the parties, the parent, master or institutional custodian is able or should be able to *foresee the risk* created by the other and can or should be able to *take precautions against that risk.*
Majority opinion at 9 (majority's emphasis omitted and additional emphasis added).

**3.** The majority consistently refers to a "duty to prevent suicide," as if that were the duty that the plaintiffs are seeking to impose upon the defendants in this case. In this respect, the majority is setting up a "straw person." Actually, the plaintiffs assert only that Corregedore owed Perreira a duty to take *reasonable action* to prevent his suicide.

Finally, fourth, just as this court has consistently exhibited a willingness to extend protections under the Hawai'i Constitution beyond the scope of "atrophied" federal constitutional rights, *see State v. Quino,* 74 Haw. 161, 176–77, 840 P.2d 358, 365 (1992) (Levinson, J., concurring), *cert. denied,* 507 U.S. 1031, 113 S.Ct. 1849, 123 L.Ed.2d 472 (1993), so should we be inclined, where appropriate, to recognize an affirmative duty in tort even though other jurisdictions have failed to do so. After all, "[i]n the past this court has expressed a willingness and a duty to depart from long established rules, and a readiness to act where precedent is lacking, in order to effect desirable changes in the common law." *Bissen v. Fujii,* 51 Haw. 636, 646, 466 P.2d 429, 435 (1970) (Levinson, J., dissenting) (citing *Lemle v. Breeden,* 51 Haw. 426, 462 P.2d 470 (1969)).

Justice is not always served by slavish adherence to limited applications of established doctrines. In *Johnston v. KFC Nat'l Management Co.,* 71 Haw. 229, 232–33, 788 P.2d 159, 161 (1990), we noted that:

> "[A]s our ideas of human relations change[,] the law as to duties changes with them.... Changing social conditions lead constantly to the recognition of new duties." W.P. Keeton, *Prosser & Keeton on The Law of Torts* § 53, at 359 (5th ed. 1984). This court, however, is reluctant to impose a new duty upon members of our society without any logical, sound, and compelling reasons taking into consideration the social and human relationships of our society.

As the Connecticut Supreme Court aptly stated:

> "Experience can and often does demonstrate that a rule, once believed sound, needs modification to serve justice better.... The adaptability of the common law to the changing needs of passing time has been one of its most beneficent characteristics[.]"

*Ely v. Murphy,* 207 Conn. 88, 94, 540 A.2d 54, 57 (1988) (quoting *Herald Publishing Co. v. Bill,* 142 Conn. 53, 62, 111 A.2d 4, 8 (1955); *Ozyck v. D'Atri,* 206 Conn. 473, 482–83, 538 A.2d 697, 702 (1988) (Healey, J., concurring)).

(Brackets in original.)

While, traditionally, "[t]he fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action," Restatement (Second) of Torts § 314 (1965), the commentary to this "traditional" rule regarding duty notes that:

> The origin of the rule lay in the early common law distinction between action and inaction, or "misfeasance" and "non-feasance." In the early law one who injured another by a positive affirmative act was held liable without any great regard even for his fault. But the courts were far too much occupied with the more flagrant forms of misbehavior to be greatly concerned with one who merely did nothing, even though another might suffer serious harm because of his omission to act. Hence liability for non-feasance was slow to receive any recognition in the law. It appeared first in, and is still largely confined to, situations in which there was some special relation between the parties, on the basis of which the defendant was found to have a duty to take action for the aid or protection of the plaintiff.
>
> The result of the rule has been a series of older decisions to the effect that one human being, seeing a fellow man in dire peril, is under no legal obligation to aid him, but may sit on the dock, smoke his cigar, and watch the other drown. *Such decisions have been condemned by legal writers as revolting to any moral sense, but thus far they remain the law. It appears inevitable that, sooner or later, such extreme cases of morally outrageous and indefensible conduct will arise that there will be further inroads upon the older rule.*

Restatement (Second) of Torts § 314 comment c (emphasis added).

I grant that the majority's unwillingness to recognize any duty on Corregedore's part in the present case may not be "revolting to *any* moral sense" (emphasis added), although it is to mine. Reasonable minds might differ

with respect to the competing policy considerations at issue in determining whether Corregedore and Perreira shared a "special relationship." However, I firmly believe that we should not shirk from perceiving such a duty simply because other jurisdictions have not.

Understanding the subjectivity of my personal "moral sense" (as well as the majority's), but considering Corregedore's official job description and the analysis set forth in the cases cited in the majority opinion, *see* section II.B. of this opinion, *infra*, I would recognize a legally cognizable duty on Corregedore's part to take *reasonable* action to seek to prevent Perreira's "foreseeable" suicide, of which he was placed on actual notice.

"'[D]uty' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." *Cootey v. Sun Inv., Inc.*, 68 Haw. 480, 484, 718 P.2d 1086, 1090 (1986). While not *directly* responsible for Perreira's psychological counseling, Corregedore was bound by a host of expressly and officially enumerated responsibilities in his capacity as a Veterans Service Counselor. *See* section II.A. of this opinion, *infra*. Specifically, Corregedore was professionally obligated to attend to Perreira's personal and psychological problems. *Id.* Accordingly, and as an implicit adjunct of those professional obligations, it follows, based on the uncontroverted record before us, that Corregedore was required by his job description to take reasonable action to seek to prevent Perreira's suicide.

I am fully aware that "whether a duty exists is a question of fairness that involves a weighing of the nature of the risk, the magnitude of the burden of guarding against the risk, and the public interest in the proposed solution." *Hao v. Campbell Estate*, 76 Hawai'i 77, 80, 869 P.2d 216, 219 (1994) (citations and internal quotation marks omitted). In this connection, our general reluctance to "impose a new duty upon members of our society without any logical, sound, and compelling reasons" is both understandable and well founded. *Johnston*, 71 Haw. at 232, 788 P.2d at 161.

But the duty that we should recognize in the present case—that a Veterans Service Counselor must employ *reasonable* means to seek to prevent a suicide when on *actual* notice of a client's suicidal intent—is not only a modest one, but is supported by "logical, sound, and compelling reasons." On the record before us, for example, the trier of fact could reasonably find that Corregedore could easily have warned Perreira's father of the immediate danger posed by Perreira's threat of self-destruction. And, as the majority takes pains to recite, there is a genuine issue of fact as to whether Corregedore did so. Corregedore testified that he advised Perreira's father of Perreira's threat of suicide and urged him "to keep an eye on [Perreira]." On the other hand, Perreira's father claimed that Corregedore did not. Majority opinion at 157, 925 P.2d at 327. At the core of the present appeal is the question whether this genuine issue of fact is "material" for purposes of Hawai'i Rules of Civil Procedure (HRCP) Rule 56.

"[W]eighing ... the nature of the risk, the magnitude of the burden of guarding against the risk, and the public interest in the proposed solution," *Hao*, 76 Hawai'i at 80, 869 P.2d at 219, imposing a duty on a Veterans Service Counselor to employ *reasonable* means to seek to prevent a client's suicide when on *actual* notice of the client's suicidal intent seems minimal, logical, sound, and compelling to me.

## II. *CORREGEDORE WAS SUBJECT TO A DUTY TO EMPLOY REASONABLE MEANS TO SEEK TO PREVENT PERREIRA'S INTENDED SUICIDE, OF WHICH HE HAD ACTUAL NOTICE, BECAUSE HE WAS OFFICIALLY CHARGED WITH THE RESPONSIBILITY OF SAFEGUARDING THE PSYCHOLOGICAL AND PHYSICAL WELL–BEING OF HIS CLIENTS.*

### A. *Corregedore's Job*

As noted above, Corregedore worked as a Veterans Services Counselor IV in the employ of the Kaua'i office of the State of Hawai'i Department of Defense, Office of

Veterans' Services, Veterans' Service Branch. Corregedore's official "position description" established that he was "responsible for administering and independently coordinating a comprehensive island-wide program of assistance to veterans [and] families of veterans[.]" As such, Corregedore was expressly employed to "initiate[ ] . and follow[ ] through with a wide range of casework, including the most complex and difficult problems on veterans services[.]" The job included the duty to "identify [clients'] particular needs or problems; decide the appropriate action to be taken and provide the necessary services; apply various interviewing and counseling techniques in assisting the clients to seek . . . benefits for which they may be eligible." A specific requirement of his position was the ability to "analyze a veteran's problem and correctly apply the appropriate rules, regulations, and skills to resolve the specific problem[.]"

Consonant with his official position description, Corregedore described his job duties in an affidavit as

> making sure veterans receive all the benefits they are entitled to, coordinating with various agencies to procure the appropriate services, such as . . . mental health services and counseling them regarding their day-to-day problems.
>
> . . . The counseling which I provide to veterans consists of identifying their concerns or problems, and explaining the options available to them to deal with the problem.

Corregedore's position as a counselor, therefore, required him to ensure that Perreira received all of the benefits and services he needed and was entitled to, including mental health services and counseling. Concerning the counseling services that he provides directly, Corregedore's affidavit averred that

> I do not provide psychiatric or psychological services to the veterans I counsel. My counseling mainly consists of listening and empathizing with the veterans.
>
> . . . When confronted with a client with emotional or mental problems I always

make arrangements for them to be seen by a mental health professional at the U.S. Veterans Center for evaluation and/or treatment.

Thus, even though Corregedore did not directly provide psychiatric counseling to veterans, he was, as a Veterans Services Counselor, responsible for ensuring that veterans received such psychiatric counseling as he perceived that they needed. For that reason, Corregedore bore a professional responsibility that I believe established a "special relationship" with his clients, thereby giving rise to a legally cognizable duty to take *reasonable* action to seek to prevent their "foreseeable" suicides, of which he was on *actual* notice.[4]

**B.** *Of The Various Counseling Cases Cited In The Majority Opinion, The Relationships Under Examination in The* **Eisel** *and* **Brooks** *Opinions Most Closely Resemble The Relationship Between Corregedore And Perreira And, Thus, Are Far More Instructive Than The Cases Concerning Licensed Mental Health Professionals Or Pastoral Counselors.*

The majority cites decisions from several jurisdictions to support its foundational view that a duty—potentially giving rise to tort liability—should not be recognized with respect to therapists, based upon a failure to take reasonable action to prevent outpatient suicides. *See* majority opinion at 164–166, 925 P.2d at 334–336. However, the majority conveniently dodges the fact that Corregedore was not Perreira's "therapist" and, by doing so, obscures the reality that its marshalled cases, which analyze the peculiar relationship between a *psychiatrist* or *pastoral counselor* and his or her patient or parishioner, are not dispositive of the question whether Corregedore, as a Veterans Services Counselor with clearly and officially delineated vocational responsibilities, owed Perreira, his client, any sort of duty in the present case.

---

4. I do not suggest that Corregedore's duty is statutorily imposed. In this regard, I express no

opinion regarding the majority's analysis appearing in section III.B. of its opinion. .

*1. The generic counselor-counselee relationship is far too broad a paradigm to be instructive in the present case.*

One fundamental flaw in the majority's analysis is that it treats fungibly all persons who in *any* way engage in *any* form of interaction that could be legitimately be characterized as "counseling." Thus, the majority disingenuously posits the "slippery slope" proposition that recognizing any duty on *Corregedore's* part in the present case would automatically dictate the imposition of a duty "to prevent suicides" on *all* "counselors" in *all* contexts:

> Public policy considerations weigh against imposing a duty on *all* counselors to prevent the suicides of noncustodial clients, because the imposition of such a broad duty could have a deleterious affect on counseling in general. For example, a duty to prevent suicides would force a counselor (e.g., a veterans services counselor, a spousal abuse counselor, a chemical dependency counselor, a marriage counselor, a priest, a rabbi, a minister, a native Hawaiian kahuna, or even a telephone hotline counselor) to breach counselor-client confidentiality and disclose a client's suicidal disposition to *all* of the client's immediate relatives, regardless of whether the client would prefer to keep such sensitive and potentially embarrassing information confidential.

Majority opinion at 170–171, 925 P.2d at 340–341 (citations omitted) (emphases added).

Without any principled or analytically necessary reason for doing so, the majority thus artificially pries open the floodgates. There is no rational basis for suggesting that *all* counselors should be treated generically; the unique characteristics of each relationship need to be examined. I maintain that the parameters of Corregedore's duty to Perreira is established by his officially delineated responsibility, *inter alia,* for facilitating the receipt by military veterans of such mental health counseling and therapeutic services as they might need. *See infra* at section II.B. of this opinion. On the one hand, a spousal abuse counselor, chemical dependency counselor, or marriage counselor could

conceivably be subject to a similar duty to take reasonable action to seek to prevent the suicide of a counselee who has clearly and unambiguously informed the counselor of his or her suicidal intent. But that duty would have to be grounded, as in the present case, in the particular job description of the counselor and the specific professional or official obligations and responsibilities that he or she has formally undertaken. A priest, rabbi, minister, native Hawaiian kahuna, or telephone hotline counselor would probably not be subject to such a duty because their respective job descriptions and professional or official obligations and responsibilities—formally undertaken—would not likely establish the requisite "special relationship" with their parishioner, counselee, or correspondent.

*2. Pastoral and similar "counseling" relationships are readily distinguishable from that between Corregedore and Perreira.*

In *Nally,* the California Supreme Court declined to recognize a duty on the part of a pastoral counselor to prevent the foreseeable suicide of a parishioner/counselee. 253 Cal. Rptr. at 109–10, 763 P.2d at 960. In so doing, the *Nally* court declined to extend the "duty to prevent a foreseeable suicide" beyond "hospital-patient relationships where the suicidal person died while under the care and custody of hospital physicians who were aware of the patient's unstable medical condition." *Id.* at 106, 763 P.2d at 956. The *Nally* court bolstered its holding with the following reasoning:

> [W]e are urged that mere knowledge on the part of the defendants that [the decedent] may have been suicidal at various stages in his life should give rise to a duty to refer. Imposition of a duty to refer ... necessarily would imply a general duty on all nontherapists to refer all potentially suicidal persons to licensed medical practitioners.
>
> One can argue that it is foreseeable that if a nontherapist counselor fails to refer a potentially suicidal individual to professional, licensed therapeutic care, the individual may . commit suicide. While under some circumstances coun-

182

selors may conclude that referring a client to a psychiatrist is prudent and necessary, our past decisions teach that it is inappropriate to impose a duty to refer—which may stifle all gratuitous or religious counseling—based on foreseeability alone. Mere foreseeability of the harm or knowledge of the danger, is insufficient to create a legally cognizable special relationship giving rise to a legal duty to prevent harm.

*Id.* at 108, 763 P.2d at 959 (citation omitted).[5]

Unlike the clergy-parishioner relationship at issue in *Nally,* Corregedore's very job description, as a Veterans Services Counselor, required the capacity to recognize "emotional or mental problems" and to effectuate appropriate referrals to mental health professionals as a necessary vocational qualification. In any event, Corregedore's duty to make such referrals in the first instance is undisputed in the present case;[6] thus, we are not faced with the risk of "stifl[ing] all gratuitous or religious counseling." Furthermore, the recognition of a duty on the part of a Veterans Services Counselor to employ reasonable means to seek to prevent a suicide when on actual notice of a client's suicidal intent is not really based on "foreseeability" as such, but rather on the intrinsic character of the Veterans Services Counselor-client relationship, which, by its very description, entailed appropriate action in the face of suicidal threats.

I do not dispute the *Nally* court's observation that "nontherapist counselors are not professional medical experts on suicide." *See supra* note 5; *see also* majority opinion at ——, 925 P.2d at 335–336. But that expertise is immaterial to my analysis because the recognition of the duty that I urge obtains only where the suicide is unambiguously threatened. The trier of fact is always free to consider particular training, or lack thereof, when determining whether a Veter-

ans Services Counselor acted reasonably under the circumstances. *See infra* note 8; *see also Bogust,* 102 N.W.2d at 230; *Nally,* 253 Cal.Rptr. at 117–19, 763 P.2d at 968–69 (Kaufman, J., concurring).

3. *The standard of care to which Veterans Services Counselors, such as Corregedore, are subject does not implicate the same confidentiality constraints as that applicable to licensed mental health professionals.*

The majority fails, in its analysis of what it perceives to be the relevant case law of other jurisdictions, to recognize and account for critical differences between Corregedore's status as a Veterans Services Counselor and that of mental health professionals licensed by the state. In this connection, and by way of example, the majority notes that,

despite [the fact] that the California Supreme Court ha[d] already held that a psychotherapist had a duty to warn others when a patient under the psychotherapist's care was likely to cause personal injury to a third party, [*see Tarasoff*], a California appellate court subsequently limited *Tarasoff,* holding that courts should not extend *Tarasoff* to require psychiatrists to disclose the confidences of their patients when the patients are contemplating suicide. *Bellah v. Greenson,* 81 Cal.App.3d 614, 146 Cal.Rptr. 535, 539–40 [ (1978) ].... [T]he *Bellah* court ... explain[ed] that, while a cause of action might exist for traditional, professional malpractice when a psychiatrist's treatment of a suicidal patient falls below the standard of care for the profession, the plaintiffs were wrong in asserting that *Tarasoff* had created a broad duty on the part of psychiatrists to breach the confidence of their doctor-patient relationships by warning others of the likelihood of a patient's suicidal disposition[.]

5. The *Nally* court further stated that "[g]enerally, there is a real question about the closeness of the causal connection between a nontherapist counselor's failure to refer to professional help and the suicide of a particular suicidal person. By their very definition, nontherapist counselors are not professional medical experts on suicide. Their activities are undertaken pursuant to doc-

trines explicitly left unregulated by the state." 253 Cal.Rptr. at 108 n. 7, 763 P.2d at 958–59 n. 7.

6. Perreira was under the care of a psychiatrist and a social worker at a Veterans Administration clinic on Kaua'i. *See* majority opinion at 156, 925 P.2d at 326.

Majority opinion at 164, 925 P.2d at 334. The *Bellah* court, as the majority recognizes at 164–165, 925 P.2d at 334–335 of its opinion, substantially grounded its holding in the necessity of "intimate privacy" within the context of psychiatric treatment:

> The imposition of a duty upon a psychiatrist to disclose to others vague or even specific manifestations of suicidal tendencies on the part of the patient who is being *treated* in an out-patient setting could well inhibit psychiatric *treatment.* ... Intimate privacy is a virtual necessity for successful *treatment.* Were it not for the assurance of confidentiality in the psychotherapist-patient relationship, many in need of *treatment* would be reluctant to seek help. Even those who do seek help under such circumstances may be deterred from fully disclosing their problems. An element usually assumed essential is the patient's trust that matters disclosed *in therapy* will be held in strict confidence. (See Fleming and Maximov, *The Patient of His Victim: The Therapist's Dilemma* (1974) 62 Cal.L.Rev. 1025, 1041.)

*Bellah,* 146 Cal.Rptr. at 539 (emphases added).

Of course, licensed mental health professionals, such as psychiatrists, are bound by ethical codes that require strict maintenance of their patients' confidences,[7] precisely for the reason described in *Bellah*—the maximization of the efficacy of the therapeutic process. But, as a Veterans Services Counselor, Corregedore is not a licensed mental health professional and does not personally perform a psychotherapeutic function. By his own undisputed account, he "do[es] not provide psychiatric or psychological services to the veterans [he] counsel[s]." "When confronted with a client with emotional or mental prob-

lems," he "*always* makes arrangements for them to be seen by a mental health professional at the U.S. Veterans Center for evaluation or treatment." (Emphasis added.) That is obviously why, in the face of the emergency precipitated by Perreira's suicidal declaration, Corregedore immediately telephoned Perreira's social worker to apprise him of the imminent crisis. That is also obviously why, according to his disputed testimony, Corregedore displayed Perreira's "last will and testament" to Perreira's father, "told him about the suicide threat, and urged him 'to keep an eye on [Perreira].'" Majority opinion at 157, 925 P.2d at 327 (brackets in original). Ironically, the majority's logic would seem to imply that, by engaging in the foregoing crisis intervention, Corregedore somehow breached a duty of confidentiality that he owed to Perreira, thus transforming his prescribed function as a Veterans Services Counselor into an "ongoing tort." I submit that such reasoning falls of its own weight.

It is precisely because Corregedore is not a licensed mental health professional that he is not subject to the physician's or psychotherapist's code of conduct. Accordingly, the majority's invocation of case authority addressing the potential civil liability of "health care workers ... [for] disclosing confidential information to third parties," majority opinion at 167–168, 925 P.2d at 337–338, is wholly inapposite to the proper resolution of this appeal. All of the cases cited by the majority deal with physicians and psychiatrists who, as licensed health care professionals, are held to an officially prescribed standard of confidentiality. Recognizing a duty on the part of a Veterans Services Counselor to take *reasonable* action to seek to avert a client's suicide—*i.e.,* a duty simply to do his or her job—would therefore neither conflict with

---

7. The majority correctly notes, at 170–171, 925 P.2d at 340–341 of its opinion, that the Hawai'i Rules of Evidence (HRE) incorporate such confidences into "privileges." *See, e.g.,* HRE 504.1(b) (1993) ("Psychologist-client privilege"), 505.5(b) (1993) ("Victim-counselor privilege"), and 506(b) (1993) (privilege relating to "Communications to clergy"). The majority neglects, however, to place these privileges in their appropriate evidentiary context. "'Privilege' is the concept whereby a *witness* is allowed to refuse to *testify*

to a particular matter, transaction[,] or communication, because public policy renders it desirable that [its] confidential nature be preserved." A. Bowman, *Hawai'i Rules of Evidence Manual* § 501–1, at 146 (1990) (quoting Sen. Stand. Comm. Rep. No. 22–80, in 1980 Senate Journal, at 1032) (emphases added) (some brackets in original and some added). Evidentiary privileges are therefore irrelevant to our analysis because they pertain only to disclosures of confidential information within a judicial setting.

any extant professional oath or obligation nor expose Corregedore, or any other similarly situated counselor, to any recognized form of civil liability.

Another significant distinction between the relationship of a psychiatrist/mental health professional to his or her patient, on the one hand, and of a Veterans Services Counselor to his or her client, on the other, is that a patient can sue the psychiatrist/mental health professional for malpractice, whereas such a claim for relief is not available to the client of a Veterans Services Counselor. Thus, in *Bellah*, the court noted that the plaintiffs'

> complaint alleged the existence of a psychiatrist-patient relationship between [the] defendant and [the decedent], knowledge on the part of the defendant that [the decedent] was likely to attempt suicide, and a failure by [the] defendant to take appropriate preventive measures. We are satisfied that these allegations are sufficient to state a cause of action for the breach of a psychiatrist's duty of care towards his patient. The nature of the precautionary steps which could or should have been taken by [the] defendant presents a purely factual question to be resolved at a trial on the merits, at which time both sides would be afforded an opportunity to produce expert medical testimony on the subject. From the face of [the] plaintiffs' complaint, we are unable to determine whether [the] defendant did or did not take preventive steps which were consonant with good medical practice in the community.

146 Cal.Rptr. at 538–39.

No malpractice action is available to the plaintiffs in the present case. Veterans Services Counselors are not currently held to a professional standard of care as psychiatrists and other mental health professionals are. The majority seems to be unwilling to acknowledge that Corregedore owed *any* duty to Perreira by virtue of the character of their professional relationship. Accordingly, although Corregedore was unquestionably a "link" in Perreira's therapeutic "chain," the majority would completely insulate him from any liability arising out of his alleged failure to discharge his vocational obligation to Perreira. This makes no sense to me.

4. *Of the relationships described in the case law cited by the majority, the relationship between Corregedore and Perreira most closely resembles those at issue in the Eisel And Brooks decisions.*

I believe that, of the relationships described in the case law cited by the majority, the relationship between Corregedore and Perreira most closely resembles that at issue in *Eisel v. Board of Education*, 324 Md. 376, 597 A.2d 447 (1991), and *Brooks v. Logan*, 127 Idaho 484, 903 P.2d 73, 79 (1995), cited and discussed at 171, 925 P.2d at 341 of the majority opinion. In *Eisel*, the Maryland Court of Appeals held that a high school guidance counselor was subject to a duty to use reasonable means to attempt to prevent the foreseeable suicide of a student. 597 A.2d at 456. The *Eisel* court observed that

> the relationship of school counselor and pupil is not devoid of therapeutic overtones. The "Counselor Job Description" ... lists the first two "[p]riorities of the counseling profession" to be:

> "1. Counseling with individuals and groups concerning school adjustment, physical and emotional development, educational planning, and career awareness. . . .

> "2. Identifying students with significant problems and taking steps to provide help for these students."

*Id.* at 452. Moreover, in "distinguish[ing] the [matter before the court] from those cases finding an absence of duty ... in which the custodial relationship between the suicide victim and the defendant was other than that of hospital and patient or jailer and prisoner," the *Eisel* court noted that

> [t]he negligence relied on is a failure to communicate to the parent the information allegedly possessed by the defendants concerning the child's contemplated suicide, *not a failure by the school authorities physically to prevent the suicide by exercising custody and control* over [the decedent victim]. The theory of [the plaintiff's]

case is that he could have exercised his custody and control, as parent, over [the decedent], had he been warned, and inferentially, that there was nothing known to the counselors about [the plaintiff's] relationship with [his daughter] that would make such a warning unreasonable.

*Id.* at 451 (emphasis added).

Although the majority maintains that the relationship between Corregedore and Perreira more closely resembles that between a psychiatrist and a patient or between a pastoral counselor and a counselee, I believe that the relationship is much more analogous to that between the high school counselor and student in *Eisel.* In *Eisel* and the present case, the counselors, by virtue of their job descriptions, were officially charged by their employers—the government—with quite specific remedial responsibilities, including ascertaining their clients' problems and needs and taking steps to address them.

The majority correctly notes that the Maryland Court of Appeals' opinion in *Eisel* was influenced by the enactment of that state's Youth Suicide Prevention School Programs Act and by the fact that the decedent was an adolescent. But these were only two among many factors considered. The *Eisel* court clearly stated that

> *Foreseeability is the most important variable in the duty calculus.* ... Here, [the decedent's] suicide was foreseeable because the defendants allegedly had direct evidence of [the decedent's] intent to commit suicide. That notice to the defendants distinguishes this case from *Bogust*, [*supra*,] where the counselor had no notice of contemplated suicide.
>
> The degree of certainty that ... [the decedent] suffered the harm foreseen is one hundred percent.

*Id.* at 452–53 (emphasis added) (citations omitted). The *Eisel* court also considered the "[b]urden on the defendant," observing that

> It may be that the risk of any particular suicide is remote if statistically quantified in relation to all of the reports of suicidal talk that are received by school counselors. We do not know. But the consequence of the risk is so great that even a relatively

remote possibility of a suicide may be enough to establish [a] duty. We pointed out in *Jacques v. First Nat'l Bank,* 307 Md. 527, 537, 515 A.2d 756, 761 (1986), that "[a]s the magnitude of risk increases, the requirement of privity is relaxed—thus justifying the imposition of a duty in favor of a large class of persons where the risk is of death or personal injury." ...

> Moreover, when the risk of death to a child is balanced against the burden sought to be imposed on the counselors, the scales tip overwhelmingly in favor of [a] duty. Certainly the physical component of the burden on counselors was slight. Eisel claims only that a telephone call, communicating information known to the counselors, would have discharged that duty here. We agree.

*Id.* at 455 (some brackets in original and some added).

The duty that the *Eisel* court imposed on the school counselor is simultaneously more and less exacting than I would impose on Corregedore, as a Veterans Services Counselor, in the present case. I am not advocating the imposition of a duty where there is merely a "relatively remote possibility of a suicide." Only where there is a clear and unambiguous expression of a suicidal intent and a stated plan for consummating it would I impose a duty on a Veterans Services Counselor to take definitive action. On the other hand, I believe that whether "only ... a telephone call[ ] communicating information known to the counselor[ ] would have discharged" Corregedore's duty in the present case constitutes a genuine issue of material fact—going to the *reasonableness, i.e.,* sufficiency, of Corregedore's action—for the trier of fact to decide. Although the standard of care that I would impose may not be completely coextensive with that articulated in *Eisel,* the analysis of the *Eisel* court remains sound and compelling.

Moreover, the fact that the school counselor in *Eisel* boasted an advanced degree in guidance and counseling and had some, albeit limited, training in suicide prevention, *Eisel,* 597 A.2d at 452, is immaterial to my "duty" analysis in the present case because Correge-

dore could—and did—readily and reasonably "foresee," without formal academic training, that Perreira intended to commit suicide. I believe that *Eisel* strongly supports the recognition of a duty on Corregedore's part to employ reasonable means to seek to prevent Perreira's intended suicide—of which he was actually aware. *Accord Hoeffner v. The Citadel,* 311 S.C. 361, 429 S.E.2d 190, 194 (1993) ("[A] professional's duty to prevent suicide requires the exercise of that degree of skill and care necessary to prevent a patient's suicide that is ordinarily employed by members of the profession under similar conditions and circumstances.").

In *Brooks,* the parents of a child who committed suicide filed a wrongful death action against their son's teacher and the school district. 903 P.2d at 75–76. The parents alleged that their son, Jeff, had made journal entries as part of an exercise assigned by the teacher, which "allude[d] to death or depression"—although the entries contained "no definite statement that he was contemplating suicide"—and that the teacher had read the entries prior to Jeff's suicide; the defendants disputed the latter allegation. *Id.* at 75. The trial court granted the defendants' motion for summary judgment on the grounds that (1) there were no genuine issues of material fact in dispute, (2) the defendants owed no duty to Jeff, and (3) the school district was statutorily immune from liability. Reversing the trial court's order, the Idaho Supreme Court noted that

> [u]nder the District's rationale, [the teacher] would have a duty to prevent Jeff's suicide if it occurred on the school grounds. Conversely, if he had stepped one foot off the school grounds and committed suicide, no duty would arise. We do not believe this arbitrary line can be drawn. For the purposes of this motion[,] we must assume that the negligence occurred, if at all, while Jeff was attending school and [the teacher] failed to seek help. The result of the alleged negligence is the only element that did not take place on the school grounds. . . .

Accordingly, we find that there is a duty which arises between a teacher or school district and a student. This duty has pre-viously been recognized by this Court as simply a duty to exercise reasonable care in supervising students while they are attending school.

*Id.* at 79.

The majority asserts that *Eisel* and *Brooks* are inapposite to the present matter because Perreira "had the freedom as an adult to enter or leave the Veterans Administration Clinic and the Office of Veterans' Services [and to] accept[ ] or refus[e] medical treatment as he pleased[.]" Majority opinion at 171, 925 P.2d at 341. As in *Brooks,* however, "the result of [Corregedore's] alleged negligence is the only element that did not take place on the [clinic] grounds." *Brooks,* 903 P.2d at 79. And, analogously to *Eisel,* "a telephone call, communicating information known to the counselors," may or may not have discharged Corregedore's duty to Perreira. *Eisel,* 597 A.2d at 455.

As a final matter, I note that the majority quotes *Eisel,* which itself cited *Farwell v. Un,* 902 F.2d 282 (4th Cir.1990), for the proposition that "[l]iability against therapists for outpatient suicides is rarely imposed, . . . and some commentators have suggested that liability under these circumstances should never be imposed." Majority opinion at 162, 925 P.2d at 332. In *Farwell,* the surviving spouse and children of a patient who committed suicide brought wrongful death and survival actions against the decedent's physician and psychiatrist. *Farwell,* 902 F.2d at 283. One of the theories advanced by the plaintiffs was that "both defendants, knowing of [the decedent's attempted suicide], were then negligent in not either involuntarily committing the decedent or at least taking steps to ensure that he would voluntarily commit in time to prevent his suicide[.]" *Id.* at 287. The *Farwell* court held that, under Delaware and Maryland law, a physician who is aware of the suicidal tendencies of a patient has a duty to "inquir[e] after a competent patient's expression of willingness to commit voluntarily[.]" *Id.* at 289. *Farwell* thus recognized a treating physician's or psychiatrist's duty to take reasonable action to avert the suicide of an outpatient, a duty which it characterized as a "modest and realistic one."

*Id.* at 289. The recognition of the duty that I urge is equally realistic, but even more modest.

## III. *CONCLUSION*

For the foregoing reasons, and on the record before us, I would hold that Corregedore owed his client, Perreira, a duty to employ reasonable means to seek to prevent the latter's intended suicide, of which Corregedore was on actual notice. I would hold further that it is for the trier of fact to determine whether Corregedore discharged that duty,[8] there being a genuine issue of material fact in that regard. *See* HRCP 56(c). I would, therefore, reverse the circuit court's order granting summary judgement and remand the case for a trial on the merits.

---

8. The parameters of the duty would necessarily be shaped by the factual record adduced at trial. In this regard, the task of the trier of fact would be to determine what constitutes "reasonable means" in light of, *inter alia*, Corregedore's job description, background, and training.